170 Wis.2d 347 (1992)
488 N.W.2d 82
SCHOOL DISTRICT OF SHOREWOOD, a school district, Plaintiff-Appellant,[]
v.
WAUSAU INSURANCE COMPANIES, an insurance corporation, and Continental Casualty Company, a foreign corporation, Defendants-Respondents.
SCHOOL DISTRICT OF GREENFIELD, a school district, Plaintiff-Appellant,[]
v.
WAUSAU INSURANCE COMPANIES, an insurance corporation and U.S. Fire Insurance Company, a foreign corporation, Defendants-Respondents.
Nos. 90-1440, 90-1707.
Supreme Court of Wisconsin.
Decided August 27, 1992.
On motion for reconsideration.
*355 CALLOW, WILLIAM G., J.
The issues before this court concern whether certain insurance policies provide coverage for the legal expenses incident to a discrimination action that seeks declaratory and injunctive *356 relief. The case joins separate but similar claims by the School District of Shorewood (Shorewood) and the School District of Greenfield (Greenfield) against their respective insurance carriers to recover under their insurance policies for attorney fees and disbursements relating to a settlement agreement in the underlying discrimination action. The circuit court granted summary judgment in favor of the insurance carriers, holding that the insurance policies at issue provided coverage for actions seeking "damages," not those seeking only declaratory and injunctive relief. The court of appeals certified the case to this court and we accepted the certification pursuant to sec. (Rule) 809.61, Stats.
Three issues are raised on this appeal. The first issue is whether allegations of discrimination as set forth in the underlying litigation fall within the scope of the insurance policies. We hold that the insurance policies, which exclude coverage for injuries that are expected, intended, or committed by or at the direction of the insured, do provide coverage for Shorewood and Greenfield where the underlying amended complaint alleges that the school districts were "affected by" the discriminatory acts of other governmental agencies.
The second issue is whether the declaratory and injunctive relief sought in the underlying litigation constituted "damages," thereby imposing upon the insurance carriers a duty to defend and indemnify the insureds in the underlying litigation. We hold that the insurance carriers had no duty to defend or indemnify Shorewood and Greenfield in the underlying action because the declaratory and injunctive relief sought do not constitute "damages" under the insurance policies.
The third issue is whether attorney fees sought in the underlying discrimination action, expended by the school districts in their defense, and paid by the school *357 districts under the settlement agreement constituted "damages," thereby imposing upon the insurance carriers a duty to defend and indemnify the insured school districts. We hold that the insurance carriers had no duty to defend or indemnify Shorewood and Greenfield based upon the request for attorney fees in the underlying amended complaint. The request for attorney fees under 42 U.S.C. sec. 1988 does not create a duty to defend on the part of the insurers because attorney fees are treated as "costs" of litigation under that federal provision and, thus, do not constitute "damages." Furthermore, we hold that the insurers had no obligation to indemnify the school districts for the attorney fees incurred by the school districts to defend themselves in the underlying action because the insurers had no duty to defend the school districts from the outset. We also hold that the insurers had no obligation to indemnify Shorewood and Greenfield for the attorney fees which the school districts agreed to pay under the settlement agreement because the insurers did not participate in or consent to the settlement agreement and the insurance policies exclude coverage for liability assumed by the insured under any contract or agreement.
The facts are not in dispute. Twenty separate one-year insurance policies are involved in the present case. The insurance policies were issued by three separate insurance carriers: Continental Casualty Company (CNA), Wausau Insurance Companies (Wausau), and United States Fire Insurance Company (U.S. Fire).
During the relevant period of time, CNA issued three separate one-year comprehensive general liability insurance policies and three separate one-year umbrella excess liability insurance policies to Shorewood. Wausau issued six one-year umbrella policies to Shorewood. In addition, Wausau issued three one-year general liability *358 policies and a single one-year umbrella policy to Greenfield. U.S. Fire issued three one-year general liability policies and a single one-year umbrella policy to Greenfield.
All of the insurance policies contained virtually identical statements with respect to the basic grant of coverage and the insurer's duty to defend. The basic grant of coverage under the policies provided that the insurer would pay all sums "which the insured shall become legally obligated to pay as damages" because of personal injury covered by the policies.[1] Under these policies, the insurers also agreed to "defend any suit against the insured seeking damages on account of such [personal injury] even if any of the allegations of the suit are groundless, false or fraudulent." Furthermore, most *359 of the insurance policies at issue here provided insurance coverage for virtually the same types of injuries and property damage.[2] They covered only those personal injuries that were "neither expected nor intended" nor "committed by or at the direction of the insured." Thus, personal injury intended by the insured was excluded from coverage under these policies.
The underlying action, Board of School Directors of the City of Milwaukee, et al. v. State of Wisconsin, et al., was initiated in the United States District Court for the Eastern District of Wisconsin. An amended complaint was filed by the Board of School District of the City of Milwaukee, individual board members, and several children ("plaintiff"). The plaintiffs named the State of Wisconsin, the Governor of Wisconsin, the Superintendent of Public Instruction, various state agencies, and 24 school districts, including Shorewood and Greenfield, as defendants.
The preliminary statement of the amended complaint stated, in part:
1. This complaint requests declaratory and injunctive relief to redress the deprivation under *360 color of state law of the rights, privileges, and immunities secured by the Constitutions and laws of the United States and the State of Wisconsin to the plaintiffs and the schoolchildren of the City of Milwaukee. It seeks to remedy the illegal racial segregation and the resulting inequality of educational opportunity and metropolitan-wide racially dual structure of education created and maintained by defendants in the Milwaukee metropolitan area.
The amended complaint alleged that the school districts were participating in intentional acts of discrimination and were "affected by" the conduct of other governmental agencies that contributed to racial segregation. The plaintiffs claimed that such conduct violated the Thirteenth and Fourteenth Amendments to the United States Constitution, various federal civil rights provisions, and the Wisconsin Constitution.
In the amended complaint, the plaintiffs prayed for the following relief:
WHEREFORE, plaintiff Milwaukee Board respectfully requests that [the] Court:
(a) enter an order ... declaring that defendants and their predecessors created, maintained, and continue to perpetuate a racially dual structure of public education ... in violation of the Fourteenth Amendment to the Constitution of the United States, the Constitution of the State of Wisconsin, and federal and State law;
(b) enter an order requiring the defendants... to cease their illegal and unconstitutional conduct and to implement a plan to correct the constitutional violations referred to above.... The plan should include the reorganization and consolidation of school districts; the establishment of magnet schools; the nondiscriminatory school assignment and transportation of pupils to reduce racial segregation; the *361 desegregation of faculty and staff; procedures for nondiscrimination in classroom and program assignments and in discipline; compensatory programs to overcome the effects of past discrimination; exemptions from mandatory transportation of pupils for racially integrated neighborhoods; the provision of bilingual education for limited and non-English speaking students as necessary; and such other provisions and programs as are needed to eliminate the remaining vestiges of segregation in the school districts and schools in the Milwaukee metropolitan area....
(c) enter an order pursuant to 42 U.S.C. § 1988 allowing plaintiffs their costs and reasonable attorneys' fees in prosecuting this complaint; and
(d) grant such other and further relief as the Court finds just and proper.
Shorewood and Greenfield notified CNA, Wausau, and U.S. Fire of the underlying litigation and tendered the defense of the suit to them. The insurance carriers refused to defend Shorewood and Greenfield in the underlying litigation on the grounds that the claims did not fall within the parameters of the insurance policies. The school districts engaged their own legal counsel and eventually entered into a settlement agreement with the plaintiffs.
The settlement agreement expressly recognized that:
The defendants have denied and continue to deny that they or their predecessors have violated the constitutional rights of any student ... that entry into this Agreement shall not constitute an admission by any party.
The agreement provided for the establishment of numerous programs, committees, and offices. First, the *362 school districts agreed to use their best efforts to fill a greater number of seats with interdistrict transfer students. The school districts would be reimbursed under sec. 121.85, Stats., for the excess costs involved in this undertaking, including transportation costs. Second, the settlement agreement provided for the establishment of a Coordinating Council to conduct minority recruitment and training programs and coordinate the Chapter 220 program.[3] Expenditures for the Coordinating Council are to be shared between the Board of School Directors of the City of Milwaukee (MPS) and the school districts. Third, the settlement agreement provided that each school district shall make a good faith effort to seek and hire minorities by adopting a minority recruitment plan. Fourth, the settlement agreement provided for the establishment of a Minority Employment Recruiting Office (MERO). The MERO would be maintained by MPS and those school districts that elect to participate in MERO as part of their own minority recruitment plan. Fifth, and finally, as part of the settlement agreement, the school districts agreed to pay the sum of $225,000 to the National Association for the Advancement of Colored People for its attorney fees and expenses. The remaining provisions of the settlement agreement involve administrative matters which do not call for an expenditure of money by the school districts.
Shorewood and Greenfield initiated separate actions against their respective insurance carriers to recover for monies expended under the settlement agreement, and attorney fees and expenses incurred in defending itself in the underlying action.[4] The two cases were consolidated. *363 Upon motions by all of the parties for summary judgment, the circuit court dismissed the complaints against the insurance carriers and held that the relief sought in the underlying complaint was declaratory and injunctive in nature and, thus, did not constitute "damages" under the provisions of the insurance policies.
Shorewood and Greenfield appealed the decision of the circuit court to the court of appeals. The court of appeals certified the case to this court and we accepted the certification. We affirm the decision of the circuit court.
The parties each filed motions for summary judgment, asserting that there were no material issues of fact. Therefore, under the standards set forth in sec. 802.08(2), Stats., we need only review whether "the moving party is entitled to a judgment as a matter of law."
The issues on appeal involve the interpretation of insurance policies. "The interpretation of words or clauses in an insurance contract is a question of law which this court decides independently of the decisions of the lower courts." Just v. Land Reclamation, Ltd., 155 *364 Wis. 2d 737, 744, 456 N.W.2d 570 (1990) (citation omitted).

I.
Shorewood and Greenfield assert that the insurers had a duty to defend because the allegations of discrimination in the underlying amended complaint fall within the scope of the insurance policies. CNA, Wausau, and U.S. Fire, on the other hand, assert that the underlying amended complaint contains only allegations of intentional discrimination which are expressly excluded from coverage.
An insurer's duty to defend the insured in a third-party suit is predicated on allegations in a complaint which, if proven, would give rise to the possibility of recovery that falls under the terms and conditions of the insurance policy. Sola Basic Industries, Inc. v. U.S. Fidelity & Guaranty Co., 90 Wis. 2d 641, 646, 280 N.W.2d 211 (1979). The duty has nothing to do with the merits of the claim because the insurer agreed to defend even if the allegations in the suit are groundless, false or fraudulent. Rather, it is the nature of the claim alleged against the insured which is controlling. Grieb v. Citizens Casualty Co., 33 Wis. 2d 552, 558, 148 N.W.2d 103 (1967). If there is any doubt about the duty to defend, it must be resolved in favor of the insured. Appleman, Insurance Law and Practice (Berdel ed.) sec. 4682. An insurer who declines to defend the insured does so at its own peril. However, the insurer should not be required to defend an insured in a suit in which the insurer has no economic interest. Appleman at sec. 4683.
To determine whether a duty to defend exists, the complaint claiming damages must be compared to the *365 insurance policy and a determination made as to whether, if the allegations are proved, the insurer would be required to pay the resulting judgment. The insurer need only look at the allegations within the four corners of the complaint to make such a determination.
Nearly all of the insurance policies at issue provide coverage for acts of discrimination unless they are expected, intended, or committed by or at the direction of the insured school districts. We must look then at the underlying amended complaint to determine whether it contains allegations of discrimination that are not expected, intended, committed by or at the direction of the insured school districts.
The underlying amended complaint contained two main theories of liability against the school districts. The first theory of liability was based on allegations of intentional discrimination and racial segregation by the school districts. Clearly, with the exception of the umbrella policy issued to Greenfield by U.S. Fire, this first theory of liability would not fall within the coverage of the insurance policies. The second theory of liability was based on allegations that the school districts were "affected by" the discriminatory conduct of other governmental agencies that contributed to racial segregation. At least two cases have recognized this theory of liability and required the affected party to participate in the subsequently-ordered remedy. See United States v. Board of School Commissioners, 573 F.2d 400 (7th Cir. 1978), cert. denied, 439 U.S. 824 (1978), and Milliken v. Bradley, 418 U.S. 717 (1974). This second theory of liability does not appear to be based on discrimination that is expected, intended or committed by or at the direction of the school districts. Therefore, if proved, it could give *366 rise to liability that may fall within the coverage of the insurance policies.
Even though the amended complaint in the underlying litigation may contain other theories of liability not covered by the insurance policies, the insurers are obligated to defend the entire action if just one theory of liability appears to fall within the coverage of the policies. Maneikis v. St. Paul Ins. Co. of Illinois, 655 F.2d 818, 822 (7th Cir. 1981). However, absent the possibility that money damages might be awarded, the insurer would have no duty to defend. Appleman at sec. 4685 (citing Seaboard Sur. Co. v. Ralph Williams' Northern Chrysler Plymouth, Inc., 504 P.2d 1139 (Wash. 1973)). In the present case, we must address whether the amended complaint in the underlying action seeks "damages" because all of the insurance policies limit the coverage to "sums which the insured shall become legally obligated to pay as damages" (emphasis added).

II.
Shorewood and Greenfield argue that the insurers had a duty to defend and indemnify them in the underlying action because the injunctive relief and compensatory programs sought in the underlying amended complaint and implemented pursuant to the settlement agreement constituted "damages" under the insurance policies. We disagree.
The insurance policies at issue fail to define the term "damages" as it is used in the policies. Shorewood and Greenfield conclude, therefore, that "damages" should be afforded a very broad definition to include all forms of civil liability, including the costs of compensatory programs and attorney fees. The undefined term "damages" is subject to judicial construction.
*367 The standards for the construction of terms in insurance policies are well-established and have been stated by this court on several occasions:
Contracts of insurance are controlled by the same principles of law that are applicable to other contracts. A policy of insurance like any other contract is to be construed so as to give effect to the intention of the parties. In the case of an insurance contract, the words are to be construed in accordance with the principle that the test is not what the insurer intended the words to mean but what a reasonable person in the position of an insured would have understood the words to mean. Whatever ambiguity exists in a contract of insurance is resolved in favor of the insured.... Words or phrases in a contract are ambiguous when they are reasonably or fairly susceptible to more than one construction.
Caporali v. Washington Nat. Ins. Co., 102 Wis. 2d 669, 675-76, 307 N.W.2d 218 (1981) (quoting Garriquenc v. Love, 67 Wis. 2d 130, 134-35, 226 N.W.2d 414 (1975)). However, when the terms of the policy are unambiguous and plain on their face, the policy should not be rewritten to include insurance coverage not agreed to by the parties and for which it was not paid. Mercado v. Mitchell, 83 Wis. 2d 17, 25, 264 N.W.2d 532 (1978).
On past occasions, we have resorted to the dictionary for guidance in discerning the ordinary meaning of terms in a contract.[5] However, in the insurance context, the term "damages" has an accepted technical meaning in law.[6] Black's Law Dictionary (6th ed.) p. 389, defines *368 "damages" as:
A pecuniary compensation or indemnity, which may be recovered in the courts by any person who has suffered loss, detriment, or injury, whether to his person, property, or rights, through the unlawful act of omission or negligence of another.
"Damages" as used in these insurance policies unambiguously means legal damages. It is legal compensation for past wrongs or injuries and is generally pecuniary in nature. The term "damages" does not encompass the cost of complying with an injunctive decree.
A noted authority on remedies explains that judicial remedies fall into four major categories: damages remedies, restitutionary remedies, coercive remedies (such as injunctions that are backed by the court's contempt power), and declaratory remedies. Dobbs, Handbook on *369 the Law of Remedies, § 1.1 at 1 (1973). This classification scheme is based on the nature and purpose of the relief awarded. Id. at 2.
The damages award is substitutionary relief, that is, it gives the plaintiff money mainly by way of compensation, to make up for some loss, but one ordinarily may be measured in money .... By way of contrast, specific remedies in law or equity, such as replevin and ejectment at law, or injunction or specific performance in equity, are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.
Dobbs, § 3.1 at 135 (footnotes omitted) (emphasis added). A classification based on the form of the action, as either equitable or legal, is irrelevant. Where the parties have contracted to limit recovery to a specific quantifiable type of remedy, a court should not alter the insurance contract to include other types of remedies not contracted for by the parties and that may not be presently quantifiable.
It should be recognized, however, that even though the main purpose of damages is compensation, there are elements of damages that are not entirely compensatory. For example, punitive damages generally are sums awarded apart from compensatory damages, usually as punishment or deterrent levied because of particularly aggravated misconduct on the part of the defendant. Therefore, our decision here in no way affects our past decisions in Brown v. Maxey, 124 Wis. 2d 424, 369 N.W.2d 677 (1985), and Cieslewicz v. Mutual Service Cas. Ins. Co., 84 Wis. 2d 91, 267 N.W.2d 595 (1978).
This limited construction of the term "damages" is consistent with the basic grant of coverage in the insurance *370 policies. The insurers agreed to pay "all sums which the insured shall become legally obligated to pay as damages." The insurers did not agree to pay "all sums which the insured shall become legally obligated to pay." The addition of "as damages" serves as a qualifier, a limit to coverage. The broad, expansive interpretation of "damages" proposed by Shorewood and Greenfield would render the phrase "as damages" mere surplusage because any expense incident to litigation would then be covered by the policies.
This limited construction of the term "damages" is also consistent with the core distinction between damages and injunctive relief, which was explained in Pure Milk Prod. Coop. v. National Farmers Org. (Pure Milk II), 90 Wis. 2d 781, 280 N.W.2d 691 (1979). Pure Milk II involved the appropriateness of a permanent injunction to prevent the National Farmers Organization from attempting to induce members of Pure Milk Products Cooperative and Associated Milk Producers, Inc. to breach their membership and marketing agreements. In Pure Milk II, we explained:
[A]n injunction is designed to prevent injury, not to compensate for past wrongs, and that an injunction may issue merely upon proof of a sufficient threat of future irreparable injury.
Pure Milk II, 90 Wis. 2d at 802. An injunction looks to the future conduct of the parties and is preventive in nature. Damages, on the other hand, are remedial in nature, not preventive. The remedy of injunction is only available if the plaintiff can establish that a continuing or anticipated injurious act is not adequately compensable in damages. Id. at 800. This is not to say that an injunction and damages cannot be sought or awarded in *371 the same cause of action. They are merely alternative or concomitant remedies. Wussow v. Commercial Mechanisms, Inc., 97 Wis. 2d 136, 152, 293 N.W.2d 897 (1980).
The apparent goal of the plaintiffs in the underlying action was the desegregation of the Milwaukee area school system. The amended complaint sought only declaratory and injunctive relief whose purpose was "to eliminate the remaining vestiges of segregation in the school districts and schools in the Milwaukee metropolitan area." The amended complaint did not seek to presently compensate the victims of past discrimination. Therefore, no "damages" were sought in the underlying action.
The school districts argue that the compensatory programs requested in the amended complaint were remedial in nature to compensate children for past inadequate education and, thus, should constitute "damages." In support of their argument, they cite Milliken v. Bradley (Milliken II), 433 U.S. 267 (1977). In Milliken II, the United States Supreme Court held that in discrimination cases, a district court can order compensatory or remedial educational programs for schoolchildren who have been subjected to past acts of de jure segregation if the programs are guided by equitable principles. Milliken II, 433 U.S. at 279-80. Shorewood and Greenfield cite Milliken II for the proposition that, like damages, compensatory educational programs are intended to restore the victims of discriminatory conduct to the position they would have enjoyed had education been administered in a nondiscriminatory manner. See Milliken II, 433 U.S. at 282. However, Milliken II does not support the proposition for which it has been cited by Shorewood and Greenfield.
*372 The Milliken II Court clearly explains that the remedial programs do not constitute damages:
The educational components, which the District Court ordered into effect prospectively, are plainly designed to wipe out continuing conditions of inequality .... Unlike the award in Edelman, the injunction entered here could not instantaneously restore the victims of unlawful conduct to their rightful condition. Thus, the injunction here looks to the future, not simply to presently compensating victims for conduct and consequences completed in the past.
These programs were not, and as a practical matter could not be, intended to wipe the slate clean by one bold stroke, as could a retroactive award of money in Edelman.... That the programs are also "compensatory" in nature does not change the fact that they are part of a plan that operates prospectively to bring about the delayed benefits of a unitary school system.
Milliken II, 433 U.S. at 290 & n.21 (emphasis in original). Similar to the educational programs in Milliken II, the programs requested in the underlying amended complaint here concerned the future provision of education. The costs of compliance with an injunction cannot reasonably be regarded as a sum payable "as damages." Damages are legal recompense for injuries sustained. Therefore, the costs of programs designed to encourage the future provision of nondiscriminatory education may not have any relation with harm to specific third parties and cannot be considered "damages" as that term is used in the insurance policies.
Additionally, the school districts cite to many cases which have held that environmental cleanup costs under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) constitute "damages" *373 under the terms of insurance policies. See Boeing Co. v. Aetna Casualty & Surety Co., 784 P.2d 507 (Wash. 1990); Newcastle County v. Hartford Acc. & Indem. Co., 673 F. Supp. 1359 (D. Del. 1987); Wagner v. Milwaukee Mutual Ins. Co., 145 Wis. 2d 609, 427 N.W.2d 854 (Ct. App. 1988); U.S. Fidelity & Guaranty v. Specialty Coatings, 535 N.E.2d 1071 (Ill. App. 1989); and CPS Chemical v. U.S. Fire Ins. Co., 536 A.2d 311 (N.J. 1988).[7] They contend that we should adopt a similar view because the relief sought in the present underlying action was money for the costs to "clean up" past wrongs through the implementation of "remedial" education programs.
Courts around the country do not uniformly agree that clean-up costs under CERCLA constitute "damages" under the terms of insurance policies. There are many courts that have held that such clean-up costs do not constitute "damages." See Mraz v. Canadian Universal Ins. Co., 804 F.2d 1325 (4th Cir. 1986); Continental Ins. Co. v. Northeastern Pharmaceutical & Chemical Co., 842 F.2d 977 (8th Cir. 1988); Verlan, Ltd. v. John L. Armitage Co., 695 F. Supp. 950 (N.D. Ill. 1988); and *374 Hayes v. Maryland Casualty Co., 688 F. Supp. 1513 (N.D. Fla. 1988), among others. The issue of whether clean-up costs constitute "damages" under the terms of an insurance contract has never been addressed by a Wisconsin court. Such an important issue should not be decided in a cursory fashion by this court. Therefore, we decline to adopt or apply the analogy posited by the school districts.
Shorewood and Greenfield also point out that the underlying amended complaint requested "further relief as the Court finds just and proper." They argue that because a court of equity has a great deal of flexibility in fashioning appropriate remedies, the court could award compensatory damages, thus, creating a duty to defend for the insurers. See White v. Ruditys, 117 Wis. 2d 130, 141-42, 343 N.W.2d 421 (Ct. App. 1983). Accepting the argument posited by the school districts would obligate insurers to defend the insured in all suits regardless of the insurance policies' provisions or whether the insurers had an economic interest in the outcome of the underlying action. The insurer should not have to speculate as to the inherent power of a court to award monetary damages where none are sought in the underlying complaint. An insurer's duty to defend is based only upon the allegations and relief sought within the four corners of the underlying complaint.
We conclude that the declaratory and injunctive relief, including the "remedial" education programs, sought in the underlying amended complaint and established in the settlement agreement do not constitute "damages" as that term is used under the insurance policies. In the insurance context, "damages" has an unambiguous and accepted technical meaning in law. We cannot *375 alter the meaning of "damages" in an insurance contract to provide coverage which was not contracted for and for which no premium was paid. Therefore, CNA, Wausau, and U.S. Fire had no duty to defend or indemnify Shorewood or Greenfield with respect to such declaratory and injunctive relief in the underlying action.

III.
The school districts are also seeking to impose upon the insurance carriers a duty to defend and indemnify the insured school districts based upon attorney fees that were sought in the underlying litigation, expended by the school districts in their defense, and paid by the school districts as part of the settlement agreement in the underlying litigation. We shall address each type of attorney fees separately.
The first type of attorney fees involved those requested by the plaintiffs in the underlying action. The amended complaint in the underlying litigation requested "an order pursuant to 42 U.S.C. sec. 1988 allowing plaintiffs their costs and reasonable attorneys' fees." Shorewood and Greenfield argue that the insurers had a duty to defend them because attorney fees, as requested in the amended complaint and paid as part of the settlement agreement, constitute "damages." We disagree.
In the present case, 42 U.S.C. sec. 1988 explicitly provides that "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." The insurers correctly point out that only one case has specifically interpreted this provision of 42 U.S.C. sec. 1988. In Board of County Commissioners of the County of Larimer v. Guarantee Ins. Co., 90 F.R.D. 405 (D. Colo. 1981), the county was a defendant in a civil *376 rights action and sought indemnification from its insurer for the payment of attorney fees which were awarded pursuant to 42 U.S.C. sec. 1988. Similar to the present situation, the underlying complaint sought only declaratory and injunctive relief. The insurance policy provided coverage for "all sums which the insured shall become legally obligated to pay as damages because of injury." The Larimer court held that attorney fees "awarded and costs assessed are not damages as contemplated by the [insurance] policy definition or as understood by the term's ordinary customary meaning in civil rights actions." Larimer, 90 F.R.D. at 407.
Shorewood and Greenfield cite to two cases which they contend reach the opposite result. They assert that under this court's holding in Milwaukee C. Co. v. Flagge, 180 Wis. 274, 193 N.W. 69 (1923), Wisconsin recognizes that an award of attorney fees may constitute "damages." However, the school districts misconstrue the holding in that case. The Flagge court upheld the principle that "attorneys' fees are not properly allowable in the assessment of damages in the order upon ... appeal unless there can be found specific authority therefor in the order of the court directing the undertaking and in the language of the undertaking itself." Flagge, 180 Wis. at 277. The Flagge court addressed the issue of whether attorney fees were properly allowable in the assessment of damages, not whether attorney fees constituted damages. Thus, Flagge is inapplicable to our inquiry here.
The other case relied on by Shorewood and Greenfield was City of Ypsilanti v. Appalachian Ins. Co., 547 F. Supp. 823 (E.D. Mich. 1982), aff'd, 725 F.2d 682 (6th Cir. 1983). The Ypsilanti court addressed the issue of whether the insurance company agreed in the contract of insurance to pay the award of attorney fees assessed against the City of Ypsilanti in the underlying litigation. *377 It held that in a civil rights suit, attorney fees are a form of damage which the insurer contracted to cover. Ypsilanti, 547 F. Supp. at 828. The Ypsilanti court reasoned that attorney fees awarded in the underlying litigation do not constitute "costs" under the insurance policy because the definition of "costs" refers only to the expense of carrying on the defense of a lawsuit. It does not refer to sums for which the insured is found liable, such as an award of attorney fees. Id. at 827. The Ypsilanti court, therefore, concluded that such attorney fees must be considered "damages."
However, Ypsilanti did not involve 42 U.S.C. sec. 1988, which expressly treats an award of attorney fees "as part of the costs." In Hutto v. Finney, 437 U.S. 678 (1978), the United States Supreme Court explained the distinction between damages and attorney fees awarded as part of the costs under 42 U.S.C. sec. 1988. The Hutto Court recognized that only prospective injunctive relief can be awarded against a state, not retroactive relief such as damages. It then upheld an award of attorney fees against the state by distinguishing between damages and costs:
Unlike ordinary "retroactive" relief such as damages or restitution, an award of costs does not compensate the plaintiff for the injury that first brought him into court. Instead, the award reimburses him for a portion of the expenses he incurred in seeking prospective relief. (An award of costs will almost invariably be incidental to an award of prospective relief, for costs are generally awarded only to prevailing parties ... and only prospective relief can be successfully pursued by an individual in a suit against a State.)
Hutto, 437 U.S. at 695 n.24.[8]
*378 The American rule is that attorney fees are generally not awarded to the prevailing party unless authorized by statute or enforceable contract. Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 260-62 (1975). However, there are numerous statutory and common-law exceptions which allow an award of attorney fees to the prevailing party in addition to statutory or judicial remedies. Some of these exceptions define attorney fees as an element of the costs, while others separate fees from other taxable costs.[9] Under 42 U.S.C. sec. 1988, attorney fees constitute part of the costs. Therefore, we conclude that an award of attorney fees under 42 U.S.C. sec. 1988 do not constitute "damages." The insurers did not have a duty to defend the school districts in the underlying action based solely on a request for attorney fees under 42 U.S.C. sec. 1988.
The second type of attorney fees involved those which the school districts incurred in their defense to the underlying action. Under the terms of the insurance policies, the insurers are obligated to pay these attorney fees only when the insurers have a duty to defend the insured. A duty to defend occurs when a suit is brought against the insured seeking damages on account of injury or damage covered by the policies. Because we hold that no damages were sought in the underlying action here, the insurers had no duty to defend Shorewood and Greenfield. Thus, the insurers are not obligated to indemnify the schools districts for the attorney fees incurred by the school districts in the underlying action.
*379 The third type of attorney fees involved those of the plaintiffs in the underlying action which Shorewood and Greenfield agreed to pay under the settlement agreement. Similar to the attorney fees requested in the underlying amended complaint, the attorney fees paid by the school districts pursuant to the settlement agreement are costs of litigation and, therefore, do not constitute "damages." Furthermore, the school districts voluntarily agreed to pay for these attorney fees. The insurance contracts at issue here exclude coverage for "liability assumed by the insured under any contract or agreement." Because the insurers did not participate in or consent to the settlement agreement, the insurers have no duty to indemnify Shorewood and Greenfield for the attorney fees they agreed to pay pursuant to the settlement agreement.
Because a request for attorney fees under 42 U.S.C. sec. 1988 does not constitute "damages" under the terms of the insurance policies at issue here, the insurers had no duty to defend Shorewood and Greenfield in the underlying discrimination action. Furthermore, the insurers had no duty to indemnify Shorewood and Greenfield for its attorney fees or the attorney fees of the plaintiffs in the underlying action which the school districts voluntarily agreed to pay without the participation or consent of the insurers.
By the Court.The decision and order of the circuit court are affirmed.
SHIRLEY S. ABRAHAMSON, J. (dissenting).
I dissent. As a matter of procedure, I think this court should not release an opinion changing the outcome of a case without the submission of new briefs and the presentation of oral argument. See also State ex rel. Richards *380 v. Foust, 165 Wis. 2d 429, 440b, 480 N.W.2d 444 (1992) (Abrahamson, J., Heffernan, C.J., and Bablitch, J. dissenting on the denial of the motion for reconsideration).
Since the court has decided to proceed with the reconsideration and to change the mandate without new briefs and without oral argument, I have reviewed the record, the briefs, the original opinions, the motions for reconsideration (which contain only arguments previously presented to the court), and the new opinion. I continue to believe that the majority opinion mandated on May 20, 1992, and published at 168 Wis. 2d 390, 484 N.W.2d 314 (1992), provides the proper disposition of the cases and the correct analysis of the issues.
NOTES
[] Motion for reconsideration filed on September 16, 1992. This petition was not disposed of at the time the volume went to press. Its disposition will be reported in a later volume.
[] Motion for reconsideration filed on September 16, 1992. This petition was not disposed of at the time the volume went to press. Its disposition will be reported in a later volume.
[1] The comprehensive general liability insurance policies issued by CNA, Wausau, and U.S. Fire all provide the following coverage:

The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of [personal injury covered by the policy]. (Emphasis added.)
Similarly, the umbrella excess liability insurance policies issued by CNA, Wausau, and U.S. Fire provide the same or similar coverage as the following:
To pay on behalf of the insured all sums in excess of the retained limit which the insured shall become legally obligated to pay, or with the consent of the company agrees to pay, as damages because of [personal injury covered by the policy]. (Emphasis added.)
All of the policies, regardless of their monetary limitations, qualify the insurer's duty of indemnification to only those sums which the insured is legally obligated to pay as damages. Therefore, when assessing the issue of whether the underlying action seeks damages which may create a duty of defense or indemnification on the part of the insurer, we need not make a distinction between the general liability policies and the umbrella policies.
[2] The umbrella policy issued to Greenfield by U.S. Fire actually provided greater coverage than the other insurance policies. Rather than limiting coverage to personal injuries sustained from unintentional acts of the insured, the U.S. Fire umbrella policy covered "an offense which results in Personal Injury, other than an offense committed with actual malice." (Emphasis added.) This umbrella policy would seem to cover personal injuries sustained from intentional acts of the insured. However, this is irrelevant to our analysis in light of our holdings that the underlying amended complaint contained allegations of unintentional discrimination which would be covered under all of the insurance policies except for our determination that the underlying amended complaint failed to seek "damages."
[3] The Chapter 220 program is the student transfer program created by sec. 121.85, Stats.
[4] In compliance with the settlement agreement in the underlying action, Shorewood paid $2,038 as its proportionate share of the NAACP's attorney fees. Shorewood also incurred and paid $251,074 for its own attorney fees to defend itself in the underlying action. From 1988-90, Shorewood paid $7,692 to fund the MERO and $11,910 to fund the Coordinating Council.

Similarly, Greenfield paid $3,315 as its proportionate share of the NAACP's attorney fees under the settlement agreement. Greenfield incurred and paid $411,594 for its own attorney fees to defend itself in the underlying action. From 1988-90, Greenfield also paid $10,378 to fund the MERO and $16,095 to fund the Coordinating Council. Both Shorewood and Greenfield continue to annually pay monies to fund these programs.
[5] See Caporali, 102 Wis. 2d at 676.
[6] See Fee v. Heritage Mut. Ins. Co., 17 Wis. 2d 364, 117 N.W.2d 269 (1962), overruled on other grounds, 99 Wis. 2d 136, 144 (1980). In Fee, this court recognized that "damages" as that term is used in a contract of insurance has an accepted technical meaning in the law. Fee, 17 Wis. 2d at 366. Courts in many other jurisdictions as well have determined that in the insurance context "damages" has an accepted technical meaning in the law. Aetna Casualty & Surety Co. v. Hanna, 224 F.2d 499, 503 (5th Cir. 1955); Continental Ins. v. Northeastern Pharmaceutical, 842 F.2d 977, 985 (8th Cir. 1988); Cincinnati Ins. Co. v. Milliken and Co., 857 F.2d 979, 981 (4th Cir. 1988); Maryland Casualty Co. v. Armco, Inc., 822 F.2d 1348, 1352 (4th Cir. 1987); Ladd Const. Co. v. Ins. Co. of North America, 391 N.E.2d 568, 571 (Ill. App. 1979); Garden Sanctuary, Inc. v. Ins. Co. of North America, 292 So. 2d 75, 77 (Fla. App. 1974); CPS Chemical v. Continental Ins., 536 A.2d 311, 315 (N.J. Super. A.D. 1988); Travelers Ins. Co. v. Ross Electric of Washington, Inc., 685 F. Supp. 742, 745 (W.D. Wash. 1988); and Desrochers v. New York Cas. Co., 106 A.2d 196, 198 (N.H. 1954), among others.
[7] The school districts' reliance on Wagner v. Milwaukee Mutual Ins. Co., 145 Wis. 2d 609, 427 N.W.2d 854 (Ct. App. 1988), for the proposition that cleanup costs constitute "damages" under the terms of an insurance policy is misplaced. The Wagner court did not address that issue. Rather, the Wagner court held that the contamination of residential property and municipal sewer lines by a gas leak from a nearby gasoline station constituted "loss of use of property" under the insurance contract's definition of "property damage." Wagner, 145 Wis. 2d at 615. No party in Wagner contested whether the detection and cleanup costs relating to the gas leak constituted "damages" under the general statement of coverage. Wisconsin is among many states that have not yet specifically addressed this issue.
[8] See also Marek v. Chesney, 473 U.S. 1, 9 (1985).
[9] See Marek, 473 U.S. at 44-51 (Brennan, J., dissenting), and Hutto, 437 U.S. at 697 n.28, for a laundry list of those federal provisions which refer to attorney fees as "costs" and those which do not refer to attorney fees as "costs."