UNITED STATES of America, Plaintiff,

v.

SECURITY MANAGEMENT COMPANY,
INCORPORATED, Defendant–Third
Party Plaintiff–Appellee.

AETNA CASUALTY AND SURETY
COMPANY, a foreign corporation,
Intervening Defendant–Appellant,

v.

VIGILANT INSURANCE COMPANY,
Third Party Defendant–Appellee.

Nos. 95–2579, 95–2693.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 9, 1996.

Decided Sept. 16, 1996.

Rehearing Denied Oct. 24, 1996.

Nathan A. Fishbach, Office of U.S. Attorney, Milwaukee, WI, Jessica Dunsay Silver, Gregory B. Friel, Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, Paul F. Hancock, U.S. Department of Justice, Civil Rights Div., Housing & Civil Enf., Washington, DC, for Plaintiff.

William J. Mulligan, Michael R. Wherry (argued), James E. Culhane, Davis & Kuelthau, Milwaukee, WI, Robert A. Smith, Riester, Smith & McCarthy, Milwaukee, WI, for Defendants-Appellees Security Management Company, Inc., in No. 95-2579; Cedar Place, Evergreen Square, Heritage Village Apartments, Southtowne Village I, Southtowne IV, Heritage Arms, Security Three, Mark V Partnership, John J. Mark, John P. Mark, Joseph Mark, Janice Mark, William P. Mark, Thomas G. Mark, Catherine Mark, Susan Frechette, Rodney Oilschlager, James Condor, William Sidesky in No. 95-2693.

John D. Bird, Jr. (argued), Bird, Martin & Salomon, Milwaukee, WI, for Aetna Casualty & Surety Company.

Edward A. Hannan (argued), Beth A. Thorson, Godfrey, Braun & Hayes, Milwaukee, WI, Michael R. Wherry, James E. Culhane, Davis & Kuelthau, Milwaukee, WI, for Vigilant Insurance Company in No. 95-2579.

Edward A. Hannan (argued), Beth A. Thorson, Majorie M. Greene, Godfrey, Braun & Hayes, Milwaukee, WI, for Vigilant Insurance Company in No. 95-2693.

Katherine L. Charlton, Schneidman, Myers, Dowling & Blumenfield, Milwaukee, WI, for Intervenors-Plaintiffs Metropolitan Milwaukee Fair Housing Council, Fair Housing Counsel of Fox Valley, Kevin Tate, Shuying N. Vang, Xiong Lee.

Before WOOD, Jr., ESCHBACH, and DIANE P. WOOD, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This complicated case arises out of a dispute over the meaning of a handful of seemingly simple words. The words in question are found in a primary insurance policy issued by Aetna Casualty and Surety Company ("Aetna") and in an "excess umbrella" policy issued by Vigilant Insurance Company ("Vigilant"). The feud concerns whether those words provide coverage to the policy holder, Security Management Company, Incorporated ("Security Management"), for alleged acts of racial discrimination in violation of the Fair Housing Act. The district court found that coverage was provided by Aetna, the primary insurer. Concluding that coverage was not provided by Aetna, but was instead provided by Vigilant, we reverse and remand.

## I. BACKGROUND

The litigation underlying this matter commenced on May 18, 1992, when the United States filed a complaint to enforce the provisions of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* The United States alleged that Security Management, as apartment managers (and others, as apartment owners), violated various provisions of the Fair Housing Act by discriminating against black and Hmong persons and families with children.[1] The Metropolitan Milwaukee Fair Housing

---

1. More specifically, the government's complaint charged Security Management with
    (a) Making dwellings unavailable in violation of 42 U.S.C. § 3604(a)....
    (b) Imposing different conditions in the rental of a dwelling, in violation of 42 U.S.C. § 3604(b)....
    (c) Making statements with respect to the rental of a dwelling which indicates a preference, limitation or discrimination on the basis of familial status in violation of 42 U.S.C. § 3604(c).
    (d) Representing that certain dwellings are not available for inspection or rental when such dwellings are in fact available, in violation of 42 U.S.C. § 3604(d).

Counsel, the Fair Housing Council of Fox Valley, and three individuals who had served as "testers" later intervened as plaintiffs.

During the period of the alleged discrimination, Aetna served as Security Management's primary insurer. Security Management also had excess umbrella coverage through Vigilant. On August 26, 1993, Aetna filed a motion to intervene as a defendant in order to obtain a determination of its duty to defend Security Management. On January 19, 1994, Security Management filed a third-party complaint against Vigilant in which it alleged that Vigilant also owed it a duty of defense and indemnification. Aetna then filed a cross-claim against Vigilant on March 31, 1994, in which it sought a declaration that Vigilant owed a duty to defend Security Management and indemnify Aetna for any amount Aetna became obligated to pay.

All of the parties eventually filed cross-motions for summary judgment. On November 29, 1994, all claims, except for those relating to coverage questions, were resolved by a consent order. Security Management agreed to pay a total of $173,000 to the intervening plaintiffs and their attorneys. Security Management also agreed to pay $45,000 to the United States as a civil penalty.

On May 31, 1995, the district court resolved the remaining coverage issues. The district court granted in part Security Management's cross-motion for summary judgment, determining that Aetna was obligated to defend and partially indemnify Security Management. The district court denied Security Management's cross-motion against Vigilant and it granted Vigilant's cross-motion for summary judgment against Security Management. Aetna now appeals the district court's coverage determination and Security Management cross-appeals the district court's determination that no indemnification is due for its payment of the intervening plaintiffs' attorneys' fees.

## II. STANDARD OF REVIEW

The cross-motions for summary judgment all hinge upon a judicial ruling on the meaning of the two policies' relevant provisions; therefore, these matters are ap-

propriate for summary resolution. *Iowa Nat'l Mutual Ins. Co. v. Liberty Mutual Ins. Co.*, 43 Wis.2d 280, 168 N.W.2d 610 (1969). We review the district court's grant of summary judgment *de novo*. *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1039 (7th Cir.1992). Under Wisconsin law, which governs this case, "[t]he construction of words and phrases in insurance policies is generally a matter of law and is controlled by the same rules of construction as are applied to contracts generally." *Kremers–Urban Co. v. American Employers Ins. Co.*, 119 Wis.2d 722, 351 N.W.2d 156, 163 (1984). As a matter of law, we construe the policies' language *de novo*. *Scottish Guarantee Ins. Co. v. Dwyer,* 19 F.3d 307, 309 (7th Cir.1994).

## III. DISCUSSION

Security Management contends alternatively that Aetna and Vigilant are obligated to defend and indemnify it under their respective insurance policies. Since the duty to defend is separate from, and broader than, the duty to indemnify, our analysis will first focus on each insurer's duty to defend.

To determine whether an insurer is obligated to assume the defense of a third-party suit, it is necessary to determine whether the complaint alleges facts which, if proven, would give rise to liability covered under the terms and conditions of the policy. Doubts about coverage must be resolved by the insurer in favor of the insured.

*Sola Basic Indus., Inc. v. United States Fidelity & Guaranty Co.*, 90 Wis.2d 641, 280 N.W.2d 211, 213–14 (1979) (citations omitted). In construing the language of a policy, "the test is not what the insurer intended the words to mean but what a reasonable person in the position of the insured would have understood the words to mean." *Kremers–Urban*, 351 N.W.2d at 163. "The duty to defend is triggered by the allegations contained within the four corners of the complaint." *Newhouse v. Citizens Sec. Mutual Ins. Co.*, 176 Wis.2d 824, 501 N.W.2d 1, 5 (1993).

### A. The Aetna Policy[2]

Coverage provided by the Aetna policy is divided into three parts—Commercial Property, Commercial General Liability, and Commercial Crime. The part relevant to the present matter, Commercial General Liability, is further divided into three sections—Bodily Injury and Property Damage Liability ("Coverage A"), Personal and Advertising Injury Liability ("Coverage B"), and Medical Payments ("Coverage C"). The parties contest the scope of Coverage A's "bodily injury" provision[3] and the scope of Coverage B's "personal injury" provision.[4]

#### 1. Personal Injury Coverage

We first turn, as did the district court, to the Aetna policy's personal injury coverage. The district court determined that the operant language was vague and it therefore interpreted the personal injury terms as a matter of law, resolving the ambiguities it uncovered in favor of the insured. Rejecting the *ejusdem generis* rule, the district court then concluded that personal injury coverage did exist for the alleged acts of discrimination. *See also Gardner v. Romano*, 688

F.Supp. 489, 492–93 (E.D.Wis.1988) (finding a duty to defend under similar language). Reviewing the language of the policy *de novo*, we conclude that coverage is not provided under this part of the Aetna policy.

First, we are uncertain of the district court's initial determination that the relevant language is vague. As quoted above, personal injury is defined to include "[t]he wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor." The parties agree that the complaints fail to invoke either the wrongful eviction or the wrongful entry clauses; it is the third clause which is the focus of the dispute. To us, the meaning of this third clause appears fairly clear: Simply put, coverage is extended to that category of cases which involve the invasion of a person's right of private occupancy. Where a term in an insurance policy is clear, it must "be given its ordinary and commonly accepted meaning." *Lawver v. Boling*, 71 Wis.2d 408, 238 N.W.2d 514, 517 (1976). Since a "right" is generally interpreted as constituting "[a] le-

---

2. During the time frame of the alleged discrimination-January, 1991, to February, 1992—there were two Aetna policies in effect. The pertinent portions of these policies, however, contain identical language.

3. The pertinent language of Coverage A provides:
    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" ... to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result.
    This coverage is conditioned as follows:
    This insurance applies to "bodily injury" ... only if:
       (1) The "bodily injury" ... is caused by an "occurrence" that takes place in the "coverage territory," and
       (2) The "bodily injury" ... occurs during the policy period.
       ....
    This insurance does not apply to:
       a. "Bodily injury" ... expected or intended from the standpoint of the insured.
    The policy defines the relevant terms as follows:
    "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.
       ....

"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

4. The pertinent language of Coverage B provides:
    We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" ... to which this coverage part applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result.
    Coverage is excluded under this section, however, for any "personal injury" which "[a]ris[es] out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured." The policy defines "personal injury," in part, as follows:
    "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:
       ....
       c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor.

gally enforceable claim of one person against another," *Black's Law Dictionary* 1189 (5th ed. 1979), and since the testers unquestionably lacked any such enforceable claim of occupancy [5] at the time they applied for these apartments, coverage is not provided under this clause. *See, e.g., Bernstein v. North East Ins. Co.*, 19 F.3d 1456 (D.C.Cir.1994); *Martin v. Brunzelle*, 699 F.Supp. 167 (N.D.Ill.1988).

We agree with the district court's criticism of the "that a person occupies" portion of the definition; it does not add much clarity to the clause. We do not feel, however, that this language participates in rendering the definition of personal injury ambiguous. Rather, we read it as merely attempting to refine the nature of the prerequisite "right" of private occupancy. By limiting coverage to those instances where "a person occupies by or on behalf of its owner, landlord or lessor," the policy seemingly excludes at least unapproved sub-lessees from coverage. By interpreting the clause to reach "dwellings that may actually be occupied," and thereby extending coverage to prospective right-holders, it appears to us that the district court impermissibly extended the breadth of coverage that Aetna contracted to provide.[6]

Even if we did agree that this language was vague, we would still disagree with the result achieved below. We believe that a reasonable insured would read the language as excluding cases where the aggrieved individual was not possessed of an existing right of private occupancy. In arriving at the opposite result, the district court first rejected the *ejusdem generis* rule.

Under the *ejusdem generis* rule, "where a general term ... is preceded or followed by a series of specific terms, the general term is viewed as being limited to items of the same type or nature as those specifically enumerated." *State v. Campbell*, 102 Wis.2d 243, 306 N.W.2d 272, 273 (App.1981). This rule is merely an "aid[ ] to construction," used "to determine what the intent of the parties was by the use of the words they used." *Carey v. Rathman*, 55 Wis.2d 732, 200 N.W.2d 591, 596 (1972).

At issue here is the listing of the terms "wrongful eviction from," "wrongful entry into," and "invasion of the right of private occupancy." The district court concluded that the *ejusdem generis* rule was inapplicable since "[n]one of these terms is a general catch-all term of which the other terms are a subdivision." In our view, this formulation represents a somewhat too narrow reading of the rule. Obviously, there must be a "catch-all" phrase in the picture in order for *ejusdem generis* to apply. After all, what use would the rule be without a general term in need of limitation? However, there is not necessarily any requirement that those more specific terms compromise a "subdivision" of the general term. *See, e.g., Kenosha County Dep't of Social Servs. v. Nelsen*, 102 Wis.2d 49, 305 N.W.2d 924, 926 (1981) (basing its holding in part on the fact that the statute in question was not "made subject to expanded interpretation by *any* catch-all phrase which would trigger application of the *ejusdem generis* rule of statutory construction") (emphasis added). Rather, Wisconsin law requires only that the general term be of "the same kind, class, character or nature" as the enumerated specific terms. *Cheatham v. State*, 85 Wis.2d 112, 270 N.W.2d 194, 198 (1978). *See also State v. Engler*, 80 Wis.2d 402, 259 N.W.2d 97, 101 (1977) ("For the doctrine of *ejusdem generis* to apply, the class of objects to which the general word is restricted must be germane to the objectives of the enactment."). In other words, the general and specific terms need only mesh together in some relevant and appropriate fashion; the terms need not necessarily have all sprung from some common source.

---

5. It is true that the Fair Housing Act entitles applicants to be free from discrimination in housing, but this entitlement is simply not coterminous with a right of occupancy.

6. We agree with the district court's conclusion that liability under this clause is not intended to "extend to premises which cannot be 'occu- pied,'" but this result may be obtained without unnecessarily expanding the scope of coverage. By limiting coverage to those "dwellings or premises that a person occupies," the policy impliedly excludes those premises which cannot be occupied.

■ Thus, the fact that these three terms delineate separate and distinct rights is not fatal to the application of the *ejusdem generis* rule, so long as these terms share some sufficiently similar trait. We conclude that the doctrine of *ejusdem generis* should be applied here. In our view, there is at least one common feature, relevant to the present inquiry, which the specific terms share in common and which they should be read as sharing with an "invasion of the right of private occupancy." An individual may not be "wronged" by an eviction or entry unless that person first possessed a "right" of occupancy. *Cf. Pipefitters*, 976 F.2d at 1040 (Illinois law). The *ejusdem generis* rule makes clear that this same right of occupancy must exist before an individual may be said to have suffered an "invasion of the right of private occupancy." [7]

After addressing the principle of *ejusdem generis*, the district court turned to the heart of this definitional clause—the "invasion of the right of private occupancy" language. As discussed above, the district court concluded that this language extended coverage to prospective tenants. In discussing this language, however, we feel that the district court misconstrued it by repeatedly referring to the policy's coverage of "the right *to* private occupancy":

> The right *to* private occupancy must be interpreted to include the right to acquire private occupancy. The right *to* private occupancy is similar to the right to housing. This right to housing has been outlined in detail by Congress in title VIII. It includes the right not to be treated in a discriminatory fashion when viewing available housing.
>
> The right *to* private occupancy includes more than situations where an individual has a possessory interest in housing.

(Emphases added). If this were indeed the language of the policy, we would be inclined to agree with the district court. The right *to* occupancy implies the right *to obtain* occupancy. The actual language of the policy, however, involves the more narrow right "of" private occupancy and all of the parties agree that the testers did not hold a right of private occupancy at the time of the alleged discriminatory conduct.

The district court also stated that its holding was compelled by its conclusion that the alternate holding would limit the phrase to a "virtually inexistent" category of cases. The district court cited only one example—cases where a building manager legally enters an apartment and then ransacks it. There are, however, other instances where coverage might conceivably be found under this language. In *Bernstein v. North East Ins. Co.*, 19 F.3d 1456 (D.C.Cir.1994), for example, the D.C. Circuit listed cases involving the warranty of habitability and nuisance as two instances where insurers had been found liable under a similar clause. *Id.* at 1458 (citations omitted). In addition, the *Bernstein* court favorably cited two further hypothetical examples provided by the insurance company in that case: the "imposition of improper restrictions on the number of visitors a tenant may have or on hours of ingress and egress." *Id. See also Town of Goshen v. Grange Mutual Ins. Co.*, 120 N.H. 915, 424 A.2d 822, 824 (1980) (holding that a complaint charging a town with creating economic hardships which destroyed the viability of the complainant's land development project and deprived him of his investment would trigger the duty to defend under a similar clause).

Therefore, we conclude that no coverage is provided under the Aetna policy's personal injury provision. If we are to find that Security Management is owed a duty of defense and indemnification, we must do so on the basis of either the Aetna policy's bodily injury coverage or Vigilant's excess umbrella coverage. The district court did not discuss

7. The district court was correct to note that the argument in favor of the *ejusdem generis* rule would have more force if the word "other" preceded the general term here. General terms subjected to the *ejusdem generis* rule do frequently include this word. *E.g., Rath v. Two Rivers Community Hosp., Inc.*, 160 Wis.2d 853, 467 N.W.2d 150, 153 (App.1991). In such cases it is clear that the general term was intended to be read in light of the more specific terms. The presence of this word is not, however, a prerequisite to the utilization of the *ejusdem generis* rule where it is otherwise clear that the terms are of the same kind, class, character or nature. *See Quesenberry v. Milwaukee County*, 106 Wis.2d 685, 317 N.W.2d 468, 472 (1982).

any ground other than Aetna's personal injury coverage. However, the resolution of this matter involves only the interpretation of insurance policies, which we construe as a matter of law, so we now turn to the remaining provisions in dispute.

### 2. Bodily Injury Coverage

The Aetna policy defines "bodily injury" to mean "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." As discussed above, to determine whether a duty to defend has arisen under this language, "the complaint claiming damages must be compared to the insurance policy and a determination made as to whether, if the allegations are proved, the insurer would be required to pay the resulting judgment." *School Dist. of Shorewood v. Wausau Ins. Cos.*, 170 Wis.2d 347, 488 N.W.2d 82, 87–88 (1992).

We have previously viewed this language through the lens of Wisconsin law and we concluded then that "we believe that the most natural reading of 'bodily injury,

sickness, or disease' indicates that 'bodily' modifies all three terms, thereby covering only injuries with some physical component." *Knapp v. Eagle Property Management Corp.*, 54 F.3d 1272, 1284 (7th Cir.1995) (citation omitted). No Wisconsin court has come to a contrary interpretation of this language since *Knapp* was decided. Therefore, we hold that an allegation of some sort of physical malady must be found within the four corners of the complaints. The complaints, however, are totally silent on this subject.[8] No adverse physical symptoms are alleged to have been caused by the discriminatory acts.[9] We conclude, therefore, that the complaints do not trigger a duty to defend under Aetna's bodily injury coverage.

### B. The Vigilant Policy [10]

The Vigilant policy is comprised of two parts: Excess Follow Form Liability Over Claims Made or Occurrence Coverage ("Coverage A") and Umbrella Occurrence Based Liability Coverage Over Retained Limit ("Coverage B"). The parties agree that only the scope of Coverage B [11] is at issue here, as

---

8. The government's complaint states: "Persons who have been victims of defendants' discriminatory practices are aggrieved persons as defined in 42 U.S.C. § 3602(i). These persons have suffered, or may have suffered, damages as a result of the defendants' conduct as described here." Section 3602(i) provides that " '[a]ggrieved person' includes any person who ... claims to have been injured by a discriminatory housing practice."

The complaint in intervention simply requests: (1) "such damages as would fully compensate the aggrieved persons for damages caused by the defendants' discriminatory conduct"; (2) "punitive damages because of the intentional and willful nature of the defendants' conduct"; and (3) "such other relief as may be just and equitable."

9. Security Management contends that the complaints impliedly include claims for emotional distress, *see United States v. Balistrieri*, 981 F.2d 916, 932 (7th Cir.1992), *cert. denied*, 510 U.S. 812, 114 S.Ct. 58, 126 L.Ed.2d 28 (1993), and that such claims logically lead to the further presumption that at least one of the victims suffered physical manifestations of this mental harm. As discussed below, we do believe that allegations of emotional harm may be read within the complaints' four corners. Security Management's argument, however, would require us to layer implication upon assumption. This we will not do under *Knapp*.

10. As is the case with the Aetna policies, there were actually two Vigilant policies in effect during the period of the alleged discrimination. The pertinent language of each of these policies, however, is identical.

11. Under the Defense Provisions heading, Vigilant agreed to "assume charge of the settlement or defense of any claim or suit against the **insured** when ... damages are sought for **bodily injury** [or] **personal injury** ... covered by this policy and to which no Underlying Insurance or **other insurance** applies."

The Vigilant defines the terms relevant to this matter as follows:
**Bodily injury means:**
  a. injury to the body, sickness or disease, disability or shock, mental anguish or mental injury sustained by any person; including death resulting from any of these at any time;
  b. assault and battery when committed by you or at your direction for the purpose of protecting persons or property.
  . . . .
**Personal injury means:**
  . . . .
  c. humiliation or discrimination EXCEPT:
  (1) when arising out of the willful violation of a statute;
  (2) when committed by or with knowledge or consent of the insured.

the amount paid by Security Management does not exceed the liability limit of the Aetna policy. Since the Aetna policy does not apply, Coverage B affords primary coverage, if the conditions for coverage are met. The parties disagree here over the scope of Vigilant's "bodily injury" and "personal injury" provisions.

### 1. Bodily Injury Coverage

■ In contrast to the Aetna policy, Vigilant's bodily injury coverage extends to "mental anguish or mental injury." The complaints do not expressly allege emotional harm, but we have previously stated that an express allegation of mental harm under these circumstances is not always necessary:

> The more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action. . . .
>
> . . . [W]e [have previously] suggest[ed] that racial discrimination, "which is one of the relics of slavery" is the type of action that one could reasonably expect to humiliate or cause emotional distress to a person.

*Balistrieri,* 981 F.2d at 932 (quoting *Seaton v. Sky Realty Co.,* 491 F.2d 634, 636 (7th Cir.1974)). Granted, this presumption may apply with less strength to the Hmong testers, as they do not suffer from a similar collective memory of slavery. But, on the other hand, racial discrimination—no matter what races are involved—is always degrading and humiliating. To the victim, the precise origin of the racial animus may be of little concern. Racial discrimination, when encountered, is such an affront to one's intelligence and individuality that we may assume, for our purposes, the presence of an allegation of psychological injury. In any event,

one of the intervening testers is black. Therefore, since the complaints requested an award of "such damages as would fully compensate aggrieved persons for damages caused by the defendants' discriminatory conduct," we conclude that the complaints should be impliedly read as requesting compensation for mental injury.

■ There remains one further hurdle to be surmounted before coverage may be found under this provision. Coverage is limited to bodily injury caused by an "occurrence." An occurrence is "an event, including continuous and repeated exposure to substantially the same general harmful conditions neither expected nor intended from the standpoint of the insured." We note that the complaints are largely concerned with allegations of willful and intentional conduct. Under the law of Wisconsin, however, only a single covered claim need be alleged to trigger the duty to defend: "Even though the amended complaint in the underlying litigation may contain other theories of liability not covered by the insurance policies, the insurers are obligated to defend the entire action if just one theory of liability appears to fall within the coverage of the policies." *School Dist. of Shorewood,* 488 N.W.2d at 88. Therefore, the question here is whether *any* allegations of unintentional misconduct may be uncovered within the four corners of the complaints.

The complaints allege that Security Management's conduct "was intentional, willful, and taken in disregard of the civil rights of others." The district court interpreted the "taken in disregard" language as reaching acts of unintentional discrimination.[12] We agree; the generally understood meaning of "disregard" is to take no notice of or overlook. Thus, this language does not allege

12. Vigilant correctly states that "and" is a conjunctive particle. *E.g., Stevens v. Farmers Mutual Auto. Ins. Co.,* 268 Wis. 25, 66 N.W.2d 668, 671 (1954). If only one act of misconduct was alleged in the complaints, Vigilant would therefore likely be correct to read this language as alleging that Security Management "intentionally and willfully acted in disregard of the civil rights of others." The complaints, however, allege that Security Management committed several different acts, some of which do not require a finding of intentional conduct to support liability. Thus,

when we view this language in favor of coverage, as we must, *Sola Basic,* 280 N.W.2d at 214, Security Management may be viewed as allegedly acting "intentionally" and "willfully" in regard to certain instances of misconduct and "in disregard of the civil rights of others" in regard to other, separate instances of misconduct. This interpretation permits us to give full force to the conjunctive nature of "and" without requiring that all alleged acts taken "in disregard of the civil rights of others" also be intentional and willful.

that Security Management's misdeeds were exclusively intentional.

Furthermore, the complaints allege generally that Security Management engaged in a "pattern or practice" of discrimination. We have held that a "pattern" may be established in the absence of proof of willful conduct. *E.g., Balistrieri,* 981 F.2d at 934. More specifically, the complaints allege that Security Management made statements which indicated a preference on the basis of family status in violation of 42 U.S.C. § 3604(c). We have also held that no showing of subjective intent to discriminate is needed to prove a violation of this section of the Fair Housing Act. *Jancik v. Department of Housing & Urban Dev.,* 44 F.3d 553, 556 (7th Cir.1995). Therefore, we read the complaints as failing to universally allege that Security Management engaged in intentional misconduct.[13] Accordingly, under our interpretation of Wisconsin law, we conclude that Vigilant had a duty to defend Security Management in this action. *School Dist. of Shorewood,* 488 N.W.2d at 88. Next, we must address Vigilant's duty to indemnify Security Management for the amounts that Security Management agreed to pay in the consent order.

In the consent order, Security Management was enjoined from discriminating in the future and it agreed to implement education and self-testing programs. Security Management also agreed to pay $5,000 to each of the three testers and $10,000 to each of the two Hmong associations which intervened in this action. Security Management further agreed to pay the lawyers for the intervenors a total of $138,000. Security Management also agreed to pay $45,000 to the United States as a civil penalty under 42 U.S.C. § 3614(d)(1)(C).

In its policy, Vigilant contracted to pay "damages when liability is imposed on the insured by law." Vigilant also agreed to pay "all costs taxed against the insured." The Wisconsin Supreme Court has stated: " 'Damages' as used in these insurance poli-

cies unambiguously means legal damages. It is legal compensation for past wrongs or injuries and is generally pecuniary in nature. The term 'damages' does not encompass the cost of complying with an injunctive decree." *School Dist. of Shorewood,* 488 N.W.2d at 89. Furthermore, "[t]he term 'damages' is sufficiently broad to cover liability for both compensatory and punitive damages." *Brown v. Maxey,* 124 Wis.2d 426, 369 N.W.2d 677, 686 (1985).

■ We agree with the district court's conclusion [14] that the $5,000 payments to the three testers and the $10,000 payments to the two Hmong associations constitute "damages" under Wisconsin law. The testers are aggrieved parties and the amounts paid to them represent compensation for past wrongs. Although the Hmong associations were not the *per se* victims of Security Management's alleged discrimination, they may be viewed as standing in the stead of the Hmong community, which was harmed. By requiring that the associations use the monies in the area in which the alleged discrimination occurred—"housing related services"—the consent order makes clear that the intent here is to compensate the Hmong community.

■ We further agree with the district court's conclusion that the $45,000 fine paid to the United States does not constitute damages as this money was not paid to compensate an aggrieved party for past wrongs. Nor does this amount constitute "costs," since "costs" typically refers to those administrative expenses incurred in the prosecution or defense of a lawsuit, not sums which one agrees to pay as a fine.

■ Last, we agree with the district court's conclusion that since attorneys' fees "are not given to aggrieved parties as compensation for past injuries," these fees cannot be viewed as "damages." Where the obtaining of attorneys' fees is expressly provided for by statute, a request for attorneys'

---

**13.** We also note that Security Management did not admit in the consent order to committing any intentional or willful acts.

**14.** The district court's analysis was based on the language of the Aetna policy. The Vigilant policy, however, contains the same language regarding "damages" and "costs."

fees is not a request for "damages." *School Dist. of Shorewood,* 488 N.W.2d at 92–93. It is true that *School Dist. of Shorewood* involved an action brought under 42 U.S.C. § 1988 and that § 1988 allows an award of attorneys' fees "as part of the costs." It is also true that the Fair Housing Act classifies attorneys' fees as separate from costs. 42 U.S.C. § 3613(c)(2). This does not mean, however, that where attorneys' fees are not costs they must constitute damages. Rather, under the Fair Housing Act, attorneys' fees and costs are separate classes of statutory remedies, in addition to—and thereby separate from—an aggrieved party's right to damages.

Therefore, we conclude that Vigilant is only obligated to indemnify Security Management for that portion of the $138,000 paid to the lawyers which does not represent attorneys' fees.

### 2. *Personal Injury Coverage*

In light of our conclusion that Vigilant incurred a duty to defend Security Management under its policy's bodily injury coverage, we need not construe the scope of coverage provided by that policy's personal injury coverage.

### IV. CONCLUSION

As we noted at the beginning, this is a difficult and complicated case, one which the district court thoughtfully and carefully considered. We agree with many of the district court's views, but for the reasons discussed above, we must REVERSE the district court and REMAND for further proceedings consistent with this opinion.

REVERSED and REMANDED.