# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 07-1896 & 07-2016

FMS, INCORPORATED,
a Maine corporation,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

VOLVO CONSTRUCTION EQUIPMENT
NORTH AMERICA, INCORPORATED,

*Defendant-Appellant,*
*Cross-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 8143—**Charles P. Kocoras**, *Judge.*

ARGUED JANUARY 25, 2008—DECIDED MARCH 4, 2009

Before FLAUM, ROVNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Like many states, Maine has a franchise statute that prohibits the termination of a franchise absent "good cause." ME. REV. STAT. ANN. tit. 10, § 1363(3)(C) (2006). FMS, Inc., was an authorized dealer of Samsung excavators in a territory that encompassed

part of the State of Maine. Volvo Construction Equipment North America, Inc., acquired Samsung's construction-equipment manufacturing business and also assumed its contractual obligations to its dealers. Volvo did not, however, acquire the Samsung trademark or trade name. Instead, Volvo was authorized to continue to manufacture Samsung-brand excavators for a limited period of three years. Volvo thus began what it called the "Volvoization" of the excavator line; changes were made to the excavator's design, and the excavators were rebranded with the "Volvo" trademark. In the course of this transition, Volvo eventually terminated many of the Samsung dealerships, including FMS.

FMS and five other dealers sued Volvo asserting a multitude of claims for relief under the laws of several states. The district court entered summary judgment for Volvo on all claims. The dealers appealed and we affirmed, with one exception: We reinstated FMS's claim under the Maine franchise law. As things stood at that point in the litigation, there remained a factual dispute over whether Volvo had good cause under the Maine statute to terminate its relationship with FMS. *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 391 (7th Cir. 2003). On remand, following completion of discovery, FMS and Volvo both moved for summary judgment. The district court denied the motions and submitted the case to a jury, which determined that Volvo lacked good cause and owed substantial damages to FMS. Volvo appeals.

We reverse. The franchise agreement in question appointed FMS as an authorized dealer of Samsung con-

struction equipment, a brand that Volvo, Samsung's successor, discontinued. Under the Maine franchise law, discontinuation of the franchise goods—here, Samsung-brand equipment—is good cause for termination. Accordingly, Volvo was entitled to judgment in its favor.

## I. Background

The background facts are described in our earlier opinion, *Cromeens,* 349 F.3d at 382-84; we reiterate only those relevant to FMS's claim under the Maine franchise law. In 1997 FMS entered into a dealer agreement with Samsung Construction Equipment America Corporation authorizing FMS to sell "[a]ll Samsung Construction Equipment for sale in North America" on a nonexclusive basis in a territory covering a portion of the State of Maine. The relationship didn't last very long. In 1998 Samsung decided to sell its construction-equipment business to Volvo, a competitor. Under the deal, Volvo acquired Samsung's construction-equipment division, including its factory and the right to use Samsung's excavator designs. Volvo also assumed Samsung's contractual obligations to its dealers.

Volvo did not, however, acquire the Samsung trademark or trade name; instead, Volvo was authorized to manufacture and sell excavators under the Samsung name for a period of three years following the acquisition. For a short time it did so, distributing the products through Samsung's network of dealers. Meanwhile, however, it began the process of "Volvoization," gradually introducing changes to make the excavators more

Volvo-like. When that process was completed in the fall of 1999, Volvo began to market the excavators under its own name. As one of Volvo's sales bulletins described it: "With these new Volvo excavators, we have taken a good excavator, the Samsung, and made it better, offering our dealers a wider range of marketing potential."

This dispute soon followed. When Volvo completed its redesign and rebranding of the excavators, it terminated the agreements with a majority of the Samsung dealers, including FMS. FMS and five of the terminated dealerships brought this suit against Volvo alleging (among other claims) breach of contract and wrongful termination under various state-franchise statutes. The district court granted summary judgment in favor of Volvo—a decision that, for the most part, we affirmed when the case was last before this court. *Cromeens*, 349 F.3d at 399. As to FMS's claim under the Maine franchise law, however, we reversed the judgment.

More specifically, we held that the Maine franchise law "evidences a strong public policy against contracts that violate the franchise law generally" and therefore applies "even when contracts purport to waive its protections." *Id.* at 391. Accordingly, we concluded as a matter of law that "FMS is entitled to the protections of the Maine franchise law." *Id.* The statute requires "good cause" before a manufacturer may terminate a franchise, and further provides that "[t]here is good cause when the manufacturer discontinues production or distribution of the franchise goods." ME. REV. STAT. ANN. tit. 10, § 1363(3)(C), (3)(C)(4). We noted that the parties dis-

agreed over whether Volvo had discontinued production of the "franchise goods" within the meaning of this provision. Volvo maintained that it had, while the dealers contended that because Volvo had made only "modest improvements to some of the excavators and rebranded them[,] . . . the excavators essentially continued to be sold in a form covered by the Dealer Agreements." *Cromeens*, 349 F.3d at 391. Based on this framing of the dispute, we concluded that "[a]t this stage of the proceedings, we believe there is a genuine factual dispute over whether Volvo had good cause to terminate FMS" and remanded the claim to the district court. *Id.*

Back in the district court, the parties completed discovery and filed cross-motions for summary judgment. Volvo argued that it had good cause to terminate the FMS dealer agreement because it was no longer manufacturing Samsung-brand excavators. In its view the "franchise goods" under the statute and the terms of the dealer agreement included only Samsung-brand construction equipment, so rebranding the excavators amounted to a discontinuation of the franchise goods within the statute's definition of good cause. The district court rejected this argument, concluding that rebranding alone did not qualify as discontinuation of the franchise goods. In its view, "discontinuation" occurred only if Volvo made such substantial changes to the excavators that they could be considered a distinct product. On that issue there were disputed facts, so the court denied both motions for summary judgment and the case was tried to a jury.

At the close of the evidence, Volvo unsuccessfully moved for judgment as a matter of law, once again arguing that its rebranding had been the equivalent of a discontinuation of the franchise goods. The court again rejected the argument, this time adding that it had been implicitly rejected by this court in the first appeal. The case was then submitted to the jury. On the central issue of whether Volvo had "discontinued the franchise goods" and therefore had "good cause" to terminate the franchise relationship under the Maine statute, the jury was instructed that it must decide whether FMS had proven, by a preponderance of the evidence, that as of the date of termination, "Volvo had not substantially changed the excavator FMS had been buying from Volvo."

The jury determined that the changes Volvo made to the rebranded excavators were not substantial enough to constitute a discontinuation as defined by the court's instruction and that Volvo therefore lacked good cause to terminate its relationship with FMS. For that improper termination, the jury awarded damages of $2.1 million. Volvo moved posttrial for judgment as a matter of law or, in the alternative, for a new trial, reiterating its argument that the district court had misconstrued both the Maine statute's "discontinuation" provision and the dealer agreement. The district court denied the motion. The court also denied FMS's motion for an award of prejudgment interest and attorneys' fees. Volvo appealed the judgment, and FMS cross-appealed the denial of attorneys' fees.

## II. Analysis

The Maine courts have not interpreted the Maine franchise law, but we have previously observed as a general matter that the purpose of state franchise and dealership laws "is to protect franchisees who have unequal bargaining power once they have made a firm-specific investment in the franchisor." *Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 135 (7th Cir. 1990). When a manufacturer appoints a dealer and authorizes the dealer to use its trademark, the dealer has an incentive to promote that brand—for example, by investing in brand-specific inventory and facilities; by advertising the products by their brand name; and by providing brand-name service, often according to specifications required by the manufacturer. But this firm- or brand-specific investment poses a potential danger to dealers. Once a dealer sinks time and money into developing a brand's reputation in its territory, there is an opportunity for the manufacturer to free ride off this investment by terminating the franchise agreement, opening its own stores, and then earning an unfair profit from the local product loyalty developed by the dealer. *Id.*; *see also Morley-Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 374 (7th Cir. 1998) (Wisconsin law) ("Dealers invest in a great deal of firm-specific, or brand-specific, capital, in the goods that they carry, and many states have concluded that this leaves the dealers vulnerable to opportunistic manufacturer behavior . . . ."); *Kenosha Liquor Co. v. Heublein, Inc.*, 895 F.2d 418, 419 (7th Cir. 1990) (Wisconsin law) ("We have deduced from the structure and history of the [dealership] statute a central function: preventing suppliers from

behaving opportunistically once franchisees or other dealers have sunk substantial resources into tailoring their business around, and promoting, a brand.").

We have noted that the magnitude of this risk is open to debate. If a franchisor did attempt to free ride off the investment of a franchisee, it would likely not be in the franchise business for long; its reputation would quickly be shot, leaving it unable to recruit future franchisees to invest in its product line. *See Fleet Wholesale Supply Co. v. Remington Arms Co.*, 846 F.2d 1095, 1097 (7th Cir. 1988). Still, Maine and many other states have viewed abusive termination as a real possibility and therefore prohibit manufacturers from terminating franchise agreements without good cause.

What amounts to good cause isn't always clear. Most franchise-protection statutes define good cause to include, at a minimum, the failure of the dealer to comply with a material term in the franchise agreement, and if the term in question is one that relates to the dealer's sales or service performance, the dealer is usually entitled to notice and an opportunity to cure. *See, e.g.*, WIS. STAT. § 135.03, .04; 815 ILL. COMP. STAT. ANN. 705/19. The Maine franchise law contains such a definition, *see* ME. REV. STAT. ANN. tit. 10, § 1363(3)(C)(1), (2), but it goes further. The statute also provides that "[t]here is good cause when the manufacturer discontinues production or distribution of the franchise goods." *Id.* § 1363(3)(C)(4). Whether Volvo had good cause under this subsection of the definition was the subject of our earlier remand.

In the district court, Volvo argued that the "franchise goods" under this provision, as applied here, means

*Samsung-brand* construction equipment, and therefore its rebranding of the excavators under the Volvo name constituted a discontinuation of the franchise goods. The district court thought that our opinion in the first appeal had implicitly rejected this argument and that Volvo was thus prohibited from raising it under the law of the case doctrine. This was understandable but ultimately incorrect. In the prior appeal, the issue was whether Maine's franchise statute governed the dealership relationship between FMS and Volvo. We concluded that it did and remanded to the district court because there were facts in dispute on whether Volvo had violated the statute by terminating FMS without good cause. *Cromeens*, 349 F.3d at 391.

It is true, as FMS notes, that Volvo raised its rebranding argument in the prior appeal. Our opinion briefly mentions the argument, as well as FMS's counterargument that Volvo's mere rebranding of the excavators with only modest design changes was insufficient to constitute a discontinuation of the franchise goods. *Id.* But our opinion did not consider these arguments on the merits, concluding only that "[a]t this stage of the proceedings, we believe there is a genuine factual dispute over whether Volvo had good cause to terminate FMS." *Id.* Therefore, we remanded "for trial as to the good cause issue under Maine law." *Id.*

Accordingly, our earlier treatment of this issue was not an implicit rejection of Volvo's argument but a refusal to decide it at that juncture of the case. The district court had not previously addressed the applicability of the Maine

statute, much less the issue of good cause. *Id.* at 389 ("[F]or reasons not apparent from the record, the district court never ruled on the applicability of the . . . Maine statute[]."). When the parties brief an issue that has not been addressed by the district court, it is not unusual for this court to remand so that the district court may consider the issue in the first instance. *Cf. Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 999 (7th Cir. 2003) (declining to decide cross-motion for summary judgment because the district court should "adjudicate [those arguments] in the first instance"). Accordingly, after addressing the threshold legal question of the applicability of the Maine statute, we went no further than to sketch the arguments on the issue of good cause and remand the claim for further development and for consideration of what then appeared to be disputed facts. As we will explain in a moment, whether Volvo's rebranding qualifies as a discontinuation of the franchise goods depends largely on the definition of "franchise" in the Maine statute and the language of the dealer agreement, neither of which was analyzed in our prior opinion.

Accordingly, we reject FMS's contention that Volvo is prohibited from raising this argument on this second appeal and proceed now to consider it on the merits. The statutory text states that good cause to terminate a franchise exists "when the manufacturer discontinues production or distribution of the franchise goods," ME. REV. STAT. ANN. tit. 10, § 1363(3)(C)(4), so the key to the analysis is to pinpoint which goods are the "franchise goods." This, in turn, depends on the statutory definition of "franchise" and the language of the dealer agreement. If the franchise

goods were limited to goods marketed under the Samsung brand, then discontinuation of that brand amounted to discontinuation of the franchise goods. If not, mere rebranding would not be enough.

The statute defines "franchise" as follows:

> "Franchise" means an oral or written arrangement for a definite or indefinite period pursuant to which a manufacturer *grants to a dealer or distributor of goods a license to use a trade name, trademark, service mark or related characteristic* and in which there is a community of interest in the marketing of goods and related services at wholesale, retail, by leasing or otherwise.

ME. REV. STAT. ANN. tit. 10, § 1361(3) (emphasis added). The definition thus centers on the grant of a license to use the franchisor's trademark or trade name in the marketing of goods and services. (The statute's "community of interest" concept, often the most difficult aspect of these laws, is not at issue here. *See Fleet Wholesale*, 846 F.2d at 1096 (The Wisconsin dealership law "does not define 'dealer' except by saying that a dealer is a distributor in a 'community of interest' with the supplier . . . which just pushes the lack of a definition to a new level of abstraction."); *Baldewein Co. v. Tri-Clover, Inc.*, 606 N.W.2d 145, 148 (Wis. 2000) ("'Community of interest' has been the most vexing phrase in the dealership definition for courts faced with applying this law.").)

The Samsung dealer agreement appoints FMS as "a nonexclusive dealer in the Territory for the sale of the Products" upon the terms and conditions set forth in the agreement. "The Products" are defined as "All Samsung

Construction Equipment for sale in North America," "including their later improved or superseding models." The most natural reading of the first quoted phrase is that FMS was a dealer in all *Samsung-brand* construction equipment. FMS suggests that the word "Samsung" refers not to the brand name but to the company, but that reading is incorrect because the dealer agreement consistently refers to Samsung Construction Equipment America Corporation either by its full name or as "the Company"—not as "Samsung."

This understanding of the dealer agreement comports with the statutory definition of "franchise," which requires a grant of "a license to use a trade name, trademark, service mark or related characteristic." ME. REV. STAT. ANN. tit. 10, § 1361(3). Other language in the dealer agreement grants FMS a right to use Samsung's trademark or trade name. In the section titled "Patents, Trademarks and Product Modification," the agreement authorizes FMS to "refer to the Products by the trademark or trade name" used by "the Company . . . in connection therewith," but only "in connection with its performance under this Agreement." This language permits FMS to use the Samsung mark and name in the marketing and sale of the construction equipment. Nothing in this language suggests that the dealer agreement covered brands other than Samsung.

The main issue, then, is the second quoted phrase in the agreement's definition of "the Products," that is, "[a]ll Samsung Construction Equipment," "*including their later improved or superseding models*." (Emphasis added.) The Volvo excavators were a design descendent of the

Samsung line, and from that fact the district court concluded that the new Volvo-brand excavators might qualify as a "later improved or superseding model" of the Samsung-brand excavators and thus be considered "franchise goods" under the statute *if* the changes Volvo made were insubstantial. The problem, however, is that the district court's reading doesn't account for the word "including." When a contractual text specifies one thing *including* another, the *ejusdem generis* canon generally requires that the latter item must be a kind of the former item. *See, e.g.*, *United States v. Sec. Mgmt. Co.*, 96 F.3d 260, 265 (7th Cir. 1996). Here, "the Products" covered by the agreement are *Samsung-brand* construction equipment "including their later improved or superseding models"—meaning later-improved or superseding models of *Samsung-brand* equipment. Accordingly, only products sold under the Samsung trademark or trade name can be "later improved or superseding models" under the dealer agreement.

It follows from this that the "franchise goods" for purposes of the Maine franchise law include only Samsung-brand equipment. As long as Volvo continued to manufacture excavators under the Samsung trademark or trade name, the statute required it to continue to supply FMS with these goods. But because the statute defines "franchise" in terms of a trademark license and the agreement authorized FMS to use only the Samsung trademark, discontinuation of the Samsung-brand line of excavators is a discontinuation of the "franchise goods" under the statute. FMS never had a *Volvo* franchise; nothing in the statute protects FMS from termination of a franchise it never had.

FMS makes a number of objections to this understanding of the statute and the dealer agreement. One is that allowing manufacturers to terminate franchises at will by simply rebranding their products undermines the purpose of the good cause requirement in the statute. Not so. As we have explained, states like Maine have required good cause to terminate franchise relationships in order to prevent manufacturers from free riding off a franchisee's *firm-specific* or *brand-specific* sunk investments. FMS has made no investment in Volvo-brand products, so there is no danger that "Volvoization" exploited any franchisee investment. Nor does our interpretation mean that manufacturers generally might resort to rebranding in order to exploit their franchisees' investments. Rebranding is expensive and requires a manufacturer to forfeit the very brand-specific recognition and local goodwill that the use of a franchise marketing system has built over time.

A second objection is that this reading of the dealer agreement makes superfluous the phrase "including their later improved or superseding models" in the agreement's definition of "the Products." This is also incorrect. Recall that the dealer agreement applies to "[a]ll Samsung Construction Equipment for sale in North America." This phrase is ambiguous as to time. Is the agreement limited to the specific Samsung equipment for sale in North America at the time the contract was signed or does it also cover other Samsung equipment introduced while the dealer agreement is in effect? The "later improved or superseding models" language clarifies the ambiguity.

We conclude, therefore, that the dealer agreement authorized FMS to sell *Samsung-brand* construction equipment, including superseding or later-improved models sold under that brand name. These are the "franchise goods" for purposes of the "discontinuation" provision in the Maine franchise law. Volvo continued to produce the franchise goods as long as it sold excavators under the Samsung name and thus was required by the Maine law to continue to supply these goods to FMS. But when it phased out the Samsung brand and began selling excavators under its own name, it discontinued the goods that were the subject of the agreement, and this was good cause to terminate FMS's franchise under the Maine statute. Accordingly, Volvo was not liable for improper termination under the statute and was entitled to the entry of summary judgment in its favor.

In light of this determination, we need not consider Volvo's remaining arguments regarding liability and damages or FMS's cross-appeal on the issue of attorneys' fees. The judgment of the district court is REVERSED, and the case is REMANDED for entry of judgment in favor of Volvo.