# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 01-3770

CROMEENS, HOLLOMAN, SIBERT, INCORPORATED,
a Texas corporation, doing business as CISCO FORD
EQUIPMENT; HAMMER EQUIPMENT SALES, a Canadian
corporation; KEIL EQUIPMENT COMPANY, a New York
corporation; et al.,

*Plaintiffs-Appellants,*

*v.*


AB VOLVO, a Swedish corporation; VOLVO EXCAVATORS
AB, a Swedish corporation; VOLVO CONSTRUCTION EQUIP-
MENT NV, a foreign corporation; et al.,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 8143—**Charles P. Kocoras,** *Chief Judge.*

———————

ARGUED SEPTEMBER 10, 2002—DECIDED NOVEMBER 7, 2003

———————


Before COFFEY, ROVNER and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* The plaintiffs sued Volvo for
breach of dealership agreements that each of the plaintiffs
had entered into with Samsung, Volvo's predecessor. The
district court entered summary judgment in favor of the
defendants because the dealership agreements contained

clauses permitting termination without cause. The plaintiffs appeal and we affirm the judgment except for one statutory claim brought by one plaintiff. For that claim, we vacate the judgment and remand.

## I.

Between 1992 and 1997, each of the plaintiffs entered into "Dealer Agreements" with Samsung corporate entities (either Samsung America, Inc. or Samsung Construction Equipment America Corporation or Samsung Construction Equipment Company, all of which we will refer to as "Samsung") to become authorized dealers of certain Samsung products in designated territories. Following the lead of the parties, we will refer to the plaintiffs as the Samsung Dealers. The Samsung products covered by the contracts are listed sometimes specifically as excavators, wheel loaders, crawler dozers, rubber tired loaders and hydraulic excavators, and sometimes generally as "Samsung Construction Equipment for sale in North America" or "Samsung Heavy Equipment" or even "all products." In one instance, the contract fails to mention the products covered. In general, though, the contracts make clear that the Samsung Dealers were authorized to sell Samsung construction equipment.

In 1998, an affiliate of Volvo Construction Equipment North America, Inc. ("Volvo") acquired Samsung's worldwide construction equipment business. As a result, Volvo assumed Samsung's contractual rights and responsibilities, including the Dealer Agreements. Volvo had an existing dealership network for similar Volvo-manufactured construction equipment and eventually decided to terminate some of Samsung's dealership agreements. In mid-1999, Volvo began contacting the Samsung Dealers to negotiate terminations of the Dealer Agreements. Volvo sent the Samsung Dealers notices that they were terminated or were

going to be terminated within sixty days pursuant to the "Termination Without Cause Provision" that is included in each of the Dealer Agreements. By June 15, 1999, all but two of the Dealer Agreements at issue here had been terminated. The remaining two were terminated on November 15, 1999 and December 31, 1999.

The Samsung Dealers took exception to the terminations, claiming that they had been promised they would not be terminated so long as they were performing adequately. They sued Volvo[1] in Arkansas state court claiming: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) violations of the Illinois Franchise Disclosure Act (all of the Dealer Agreements contained an Illinois choice-of-law provision); (4) violations of the Arkansas Franchise Practices Act; (5) violation of the Texas Farm, Industrial and Outdoor Power Equipment Dealer Act; (6) violation of the Texas Deceptive Trade Practices—Consumer Protection Act; (7) violations of the Maine Franchise Law for Power Equipment Machinery and Appliances; (8) violations of a Montana statute that prohibits grantors from terminating dealership agreements without good cause; (9) tortious interference with contractual relations and prospective economic advantage; (10) misappropriation; (11) unjust enrichment; (12) estoppel; and, for good measure, (13) recoupment. Volvo settled with the only non-diverse plaintiff and then removed the case to the United States District Court for the Eastern District of

---

[1] They sued a number of Volvo corporate entities, including AB Volvo, a Swedish corporation; Volvo Excavators AB, a Swedish corporation; Volvo Construction Equipment NV, a foreign corporation, Volvo Construction Equipment North America, Inc.; and Samsung Heavy Industries Company, Inc. The district court dismissed all of the defendants except Volvo Construction Equipment North America, Inc., and the appeal is directed at that one remaining defendant, whom we will refer to as "Volvo."

Arkansas. The district court then granted Volvo's motion to transfer the case to the United States District Court for the Northern District of Illinois. Volvo subsequently moved for summary judgment.

The district court granted the motion in its entirety. The court first noted that its jurisdiction rested solely on diversity. Although a court sitting in diversity normally applies the choice-of-law rules of the state in which it sits, when a case has been transferred from another district, the court instead applies the choice-of-law rules that the court in the transferring state would apply. *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). In this case, the district court noted, an Arkansas choice-of-law provision governed. Arkansas law provides that the parties to a multistate transaction may choose their own law so long as it bears a reasonable relation to the transaction. *Arkansas Appliance Distrib. Co. v. Tandy Electronics, Inc.*, 292 Ark. 482, 485, 730 S.W.2d 899, 900 (1987); Ark. Stat. Ann. § 85-1-105(1). The parties here chose to apply the law of Illinois. At the time the parties signed the contract, Samsung Construction Equipment America Corporation was an Illinois company with its principal place of business in Illinois. Samsung Construction Equipment Company was a division of Samsung America, Inc., which was a New Jersey corporation with its principal place of business in Illinois. The plaintiffs in this diversity suit, of course, are all citizens of other states and foreign jurisdictions. Although the contracts were later assigned to Volvo, a Delaware corporation with its principal place of business in North Carolina, the contracts bore a sufficient connection to Illinois at the time they were executed to uphold the choice of Illinois law. There is no evidence, for example, that Samsung sought to apply the law of Illinois in order to avoid some less favorable law in a state more connected to the transactions. *See Tandy*, 292 Ark. at 485-86; 730 S.W.2d at 900. The district court remarked that much of the training and support

provided to the Samsung Dealers took place in Illinois, providing an additional connection to the State. Therefore, as the district court did, we will apply the law of Illinois to the contracts.

At the time Volvo sought to terminate the Dealer Agreements, five of the seven contracts had already expired under their own terms. The district court found that for the five expired contracts, the parties either continued to operate under the terms of the original agreements or the relationships became terminable at will. In either case, the court held, Volvo had a right to terminate the relationships without cause. The court rejected the Samsung Dealers' attempt to apply the Illinois Franchise Disclosure Act (the "IFDA") to the contracts. The IFDA provides that franchises may not be terminated without cause, and that parties may not waive this protection in their contracts. *See* 815 ILCS §§ 705/19, 41. The court found that the IFDA did not apply because by its own terms it was limited in application to franchises located within the State of Illinois, and none of the franchises here were in Illinois. The court also declined to apply the IFDA because to do so would allow a general choice-of-law provision to trump a specific contradictory term of a bargained-for contract between sophisticated parties. Similarly, the anti-waiver provision of the IFDA did not help the Samsung dealers, according to the court, because it applied only to dealerships located within the State.

The district court rejected the Samsung Dealers' claim that Volvo breached the covenant of good faith and fair dealing by terminating the dealerships without cause because the contracts provided that the agreements could be so terminated. To hold otherwise, the court stated, would allow an implied covenant to replace an express contractual term. No quasi-contractual relief was available for the Samsung Dealers because that relief is available only when there is no express contract between the parties. The claim

that Volvo tortiously interfered with its own relationship
with the Samsung Dealers failed, according to the district
court, because a party cannot tortiously interfere with its
own contracts. To the extent the Samsung Dealers were
claiming Volvo tortiously interfered with the Dealers'
relationships with their customers, the district court held
that the claim could not survive summary judgment. One of
the elements of tortious interference is that the defendant
must act without justification to induce a breach of contract.
The court found that Volvo merely passed on truthful
information to the Samsung Dealers' customers, and that
supplying truthful information did not qualify as an
unjustified act. The court did not specifically rule on the
claims related to franchise laws in the states where particu-
lar plaintiffs resided, but granted summary judgment as to
all claims. The Samsung Dealers appeal.

## II.

On appeal, the Samsung Dealers maintain that the IFDA
applies to them even though they are located outside of
Illinois. They argue that the IFDA invalidates the "ter-
mination without cause" provisions in each of their con-
tracts, and that the terminations violated the IFDA. They
also contend that the choice-of-law provisions do not void
the additional protections available in the states where
some of the franchises are located. In particular, they ask
us to apply the law of Texas, Maine and Montana, which
each prohibit in-state dealers from waiving statutory pro-
tections. The Samsung Dealers urge us to find that the
terms of the contracts consisted not only of the writings
submitted here but also include oral promises, implied
covenants of good faith and fair dealing, and the course of
dealing among the parties over the course of the relation-
ships. The Samsung Dealers defend their claims for unjust
enrichment and recoupment as allowable pleadings in the

alternative. Finally, they maintain that their claims for tortious interference were improperly dismissed.

## A.

We begin by addressing whether the protections of the IFDA are available to the Samsung Dealers. The Dealers are anxious to apply this statute because it prohibits terminations of franchises without cause. *See* 815 ILCS § 705/19. The Dealers point out that each contract contained a choice-of-law clause specifying that the contracts would be construed and interpreted in accordance with the law of the State of Illinois. The IFDA is a provision of Illinois law but, by its own terms, the IFDA applies only to franchises located within the State of Illinois. The Dealers are located in Texas, Maine, Montana, New York, Alberta and Saskatchewan. Relying on the Restatement (Second) of Conflict of Laws ("R2d"), the Samsung Dealers argue that the choice-of-law provision requires the application of the substantive portions of the IFDA to the agreements but not the limitations related to territorial scope:

> In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

R2d, § 187(3). The commentary of that section further clarifies:

> The reference, in the absence of a contrary indication of intention, is to the "local law" of the chosen state and not to the that state's "law," which means the totality of its law including its choice-of-law rules. When they choose the state which is to furnish the law governing the validity of their contract, the parties almost certainly have the "local law" rather than the "law" of that state in mind.

R2d, § 187(3), Commentary. Because the parties expressed no contrary intention, the Samsung Dealers maintain that they meant to invoke the substantive protections of the IFDA but not its territorial limitation, which they characterize as procedural and falling outside the bounds of "local law."

We agree with Volvo that the commentary to section 187(3) does not exclude territorial limitations from its definition of local law; rather, the commentary excludes only choice-of-law rules from local law. A number of courts have held that a state's territorial limitations apply even when that state's law is selected for application by a choice-of-law provision. For example, the Sixth Circuit considered the applicability of the IFDA to a contract between an Illinois franchisor and an Ohio franchisee. *Highway Equip. Co. v. Caterpillar Inc.*, 908 F.2d 60 (6th Cir. 1990). The agreement in that case designated Illinois law as the parties' law of choice. The court noted that the Illinois Supreme Court had stated it would not give extraterritorial effect to Illinois statutes unless the legislature expressly directed it to do so. *Graham v. General U.S. Grant Post No. 2665, V.F.W.*, 43 Ill.2d 1, 6-8, 248 N.E.2d 657, 660-61 (1969). When the Illinois legislature re-enacted the IFDA in 1988, it added a provision limiting application of the law to franchises located within Illinois. The Sixth Circuit understood that amendment as confirmation that the legislature intended to protect Illinois residents only and therefore declined to apply the IFDA extraterritorially even to an agreement requiring the application of Illinois law. *Caterpillar*, 908 F.2d at 63-64.

Similarly, the Fourth Circuit refused to apply New York regulatory law to a distributor agreement that contained a New York choice-of-law provision. *Peugeot Motors of America, Inc. v. Eastern Auto Distributors, Inc.*, 892 F.2d 355 (4th Cir. 1989), *cert. denied*, 497 U.S. 1005 (1990). The

regulatory law was limited by its own terms to distributors who "sell[ ] or distribute[ ] in this state." 892 F.2d at 358. The distributor had never done business in New York. The court concluded that the regulations could not be applied to the distributor contract even though the agreement specified that New York law would apply. Instead the court turned to New York common law to interpret the contract at issue. 892 F.2d at 358.

We faced a similar issue regarding the application of Wisconsin's Fair Dealership Law ("WFDL") to a contract that prohibited product sales in Wisconsin. *Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 973 (7th Cir. 1999). The contract contained a choice-of-law clause providing that it "shall be governed by and construed in accordance with the internal laws of the State of Illinois." 172 F.3d at 973. The company producing the products was based in Wisconsin and had made substantial investments in Wisconsin to allow it to manufacture products for sale and distribution elsewhere. Although the company had invested in infrastructure in Wisconsin, a quirk in the contract prohibited sales in Wisconsin. The company nonetheless sought to bring a case under the WFDL. In deciding that case, we remarked:

> We know of nothing that would prevent the Wisconsin legislature from announcing a particular choice of law rule for dealership cases in duly enacted legislation. That, in fact, is what the legislature has done. The WFDL specifies who can take advantage of its protections through its definitions of the terms "dealer" and "dealership," and thus obviates the need to resort to general choice of law principles.

*Caterpillar*, 172 F.3d at 976. We therefore looked to the law itself rather than to general choice of law rules to determine if the legislature meant for it to apply. Because the statute defined "dealer" to mean "a person who is a grantee of a

dealership situated in this state," we held that the protections of the WFDL were available only to dealerships that do business within the geographic confines of the states of Wisconsin. This holding was bolstered by the fact that we had previously concluded that the Wisconsin Supreme Court would not construe the WFDL to apply extraterritorially and that therefore a dealer seeking relief under that statute could not recover damages for lost sales arising out of the termination of out-of-state dealerships. 172 F.3d at 976.

We are inclined to agree with this line of reasoning. The plain language of the Illinois law that the Samsung Dealers seek to apply excludes those same dealers from its coverage because they are located outside of Illinois. Nothing in the Restatement suggests a contrary result. The Restatement excludes from "local law" only the choice-of-law rules of the state, not any territorial limitations contained in the statute. The Samsung Dealers paradoxically argue that the application of the IFDA is required, not by the law of Illinois, but rather by the intention of the parties. This is a circle from which the Samsung Dealers cannot successfully emerge. If they insist (as they must, because the contract chooses Illinois law) that Illinois law applies, then we must look to the law of Illinois to determine the scope of application. The IFDA limits its scope to franchises located within the state, and the Samsung Dealers may not claim its protections.

**B.**

Certain of the Samsung Dealers claim additional protections from the franchise laws of the states in which they are located. Texas, Maine and Montana prohibit in-state dealers from waiving those states' statutory protections against termination without cause. Citing section 187 of the Restatement (Second) of Conflict of Laws, the Samsung

Dealers argue that a party's choice of a certain state's law does not preclude the application of statutory protections within that party's own state if enforcement of the chosen state's law would be contrary to the express public policy of the state's law that would otherwise apply. We considered a similar claim in *Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 132 (7th Cir. 1990). Wright-Moore was an Indiana company that entered into a franchise agreement with a franchisor incorporated in New York with its principal place of business in New Jersey. The contract specified that New York law would govern the agreement. When Ricoh refused to renew the agreement after it expired by its own terms, Wright-Moore brought a claim under the Indiana franchise laws. Indiana law, like Illinois law, prohibits terminations without good cause, and also prohibits waiver of its protections. Indeed, the Indiana statute prohibits "limiting litigation brought for breach of the [franchise] agreement in any manner whatsoever." 908 F.2d at 132. Ricoh claimed economic self-interest as the "good cause" required by the statute, and also argued that New York rather than Indiana law should apply under the contractual choice-of-law provision.

We deferred to the district court's finding that Indiana had a strong public policy against allowing contractual choice-of-law provisions to control the applicability of its laws to Indiana franchises. But Indiana law, following the Restatement, permits state public policy to override contractual choice-of-law only if the state has a materially greater interest in the litigation than the contractually chosen state. 908 F.2d at 132-33. "Thus, for the Indiana public policy to control the choice of law, Indiana must have a materially greater interest in the litigation than does New York." 908 F.2d at 133. We concluded that Indiana in fact had a materially greater interest in the litigation than New York because the franchisee was incorporated and located in Indiana, the witnesses and documents relevant to the

claims were located in Indiana, the contract negotiations occurred in Indiana, and the contract was, in part, performed in Indiana. *Id.* New York's only connection to the litigation was that the defendant was incorporated there. We concluded that, because Indiana had a materially greater interest than New York, and because the application of New York law would be contrary to a fundamental Indiana policy, Indiana franchise law should govern.

Before the district court, Volvo argued that the Texas and Montana statutes did not apply because the type of equipment covered by the contracts does not come under those statutes' protections. Volvo did not argue in the court below that the Maine statute did not apply to the equipment at issue. Instead, Volvo contended before the district court that, even if those statutes applied to the contracts in question, it had "good cause" to terminate the dealerships as that term is defined by the Texas, Maine and Montana statutes. On appeal, Volvo argues for all three states that the statutes do not apply to the equipment covered by the contracts, and that even if they did apply, Volvo had good cause for the terminations. For reasons that are unclear from the record, the district court did not address whether Texas, Maine and Montana law would override the choice-of-law provision in the contracts with franchisees located in those states.

There are three distinct questions here that must be answered. First, we must determine whether the Texas, Maine and Montana franchise statutes apply to the equipment at issue here. Second, using the analysis we set out in the *Ricoh* case, we must determine whether the states of Texas, Maine and Montana evinced a public policy against allowing choice-of-law provisions to control the applicability of those states' franchise laws to the contracts at issue. If they did demonstrate that public policy, we must determine whether those states have a materially greater interest in the litigation than the contractually chosen state of Illinois.

Third, we must determine whether there is a genuine issue of material fact regarding Volvo's asserted good cause for the terminations. If the statutes do not cover the equipment detailed in the contracts, there is no need to proceed to the second and third questions, and so we will begin there.

The Texas statute in question is titled "Farm, Industrial, and Outdoor Power Equipment Dealer Agreements." Texas Bus. & Com. Code Ann. § 19.01 (Vernon 1996). The law specifies in relevant part:

> "Equipment" means farm tractors, farm implements, utility tractors, industrial tractors, and outdoor power equipment and the attachments to or the repair parts for those items.
>
> . . . .
>
> "Outdoor power equipment" means any machinery operated by an engine or electric power and used in landscaping or cultivation of land for non-agricultural purposes, and includes law and garden implements.

Texas Bus. & Com. Code Ann. §§ 19.01(8) & (10) (Vernon 1996). Three of the Samsung Dealers are Texas corporations with their principal places of business in Texas. They are Cromeens, Holloman, Sibert, Inc. d/b/a Cisco Ford Equipment ("Cisco"); Con-Equip, Inc. ("Con-Equip"); and Con-Equipment, Inc. ("Con-Equipment"). Cisco's Dealer Agreement with Samsung specifies the products covered by the agreement as "Cr. Excavators," "Wheel Loaders," and "Crawler Dozers." Both Con-Equip's and Con-Equipment's Dealer Agreements cover "Samsung Construction Equipment for sale in North America." When we compare the products listed in the contracts with the equipment covered by the statute, we must conclude that the Texas statute was not intended to apply to the types of dealerships held by the Samsung Dealers in Texas. The contracted-for products are clearly construction equipment and not the farm equipment contemplated by the Texas statute. We conclude that the Texas Samsung dealers were not entitled to the protections

of the Texas law. For that reason, we need not engage in the conflict-of-law analysis set forth in *Ricoh* for the Texas dealers.

We turn next to Montana. The statute there is titled "Termination, Cancellation, Nonrenewal, or Substantial Alteration of Farm Implements Dealership Agreements." Mont. Code Ann. § 30-11-801 (2001). On reviewing the title, it should be no surprise that the statute covers dealership agreements for farm implements:

> Farm implement means any vehicle, machine or attachment designed or adapted and used exclusively for agricultural operations and only incidentally operated or used on the highways.

Mont. Code Ann. § 30-11-801(7). Only one of the Samsung Dealers is a Montana corporation, Performance Machinery Company ("PMC"). PMC's Dealer Agreement specifies that the products covered by the agreement are "Samsung Heavy Equipment." The Samsung Dealers maintain that some of the products that PMC purchased from Samsung were sold to farmers and/or other agricultural operators for the exclusive use of digging irrigation ditches in farming fields, and for use in platting land for agricultural use. They maintain that these sales bring the equipment within the definition of "farm implement" in the Montana statute. We agree with Volvo that the use by some farmers of some of the equipment cannot convert construction equipment into farm implements. The statute specifies that the equipment must be designed **and** used exclusively for agricultural operations. At best, the Samsung Dealers claim only that some of the construction equipment was used incidentally for farming purposes. Because the Montana statute does not apply to PMC's Dealer Agreement, we once again forego the *Ricoh* conflict of law analysis.

That leaves Maine. FMS, Inc. ("FMS") is a Samsung Dealer incorporated in Maine and with its principal place of business in Maine. The Maine statute is much broader than those of Texas or Montana, and it may be for this reason that Volvo did not argue before the district court that the Maine statute did not apply to the equipment at issue. Instead, Volvo argued that even if the Maine law applied, Volvo had good cause to terminate the dealership. The Maine statute is titled "Franchise Laws for Power Equipment, Machinery and Appliances." 10 M.R.S.A. §1361. The products covered by the Maine statute are:

> residential, recreational, agricultural, farm, commercial or business equipment, machinery or appliances that use electricity, gas, wood, a petroleum product or a derivative of a petroleum product for operation.

10 M.R.S.A. §1361(8). Samsung's contract with FMS covers "All Samsung Construction Equipment for sale in North America."

Recall that Volvo failed to raise its claim that the Maine statute did not apply to the equipment at issue in the court below until its reply brief on summary judgment. Instead, Volvo argued that, even if the Maine law applied, it had good cause to terminate the agreement. The Samsung Dealers contend that Volvo has waived the issue on appeal, citing *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). There we held that issues not raised before the district court are waived on appeal. But Volvo did not completely fail to raise the issue; it merely raised it late. Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue. As we noted previously, for reasons not apparent from the record, the district court never ruled on the applicability of the Texas, Montana and Maine statutes. On appeal, the Samsung Dealers raised the applicability of

the Maine law in their opening brief. Although the district court was entitled to deem the issue waived below, the Samsung Dealers have waived waiver by raising the issue here and addressing it substantively. *Riemer v. Illinois Dept. of Transp.*, 148 F.3d 800, 805 (7th Cir. 1998). Volvo is therefore entitled to respond at this stage of the proceedings.

The very materials upon which Volvo relies support the Samsung Dealers' position. Both the legislative history of the Maine statute and the single case cited by Volvo acknowledge that, although the law was initially written to protect snowmobile dealers, the legislature greatly expanded the statute to protect franchisees selling any electric or gas-powered equipment, machinery or appliance (with an exception not relevant here). *See Rolec, Inc. v. Finlay Hydrascreen USA, Inc.*, 917 F. Supp. 67, 68 (D. Me. 1996); 116th Maine Legislature, 1st Reg. Session, L.S. 364, Comm. Amend. A, at 7. The Maine statute is broad enough to encompass Samsung construction equipment for sale in North America. Therefore, we must address the conflict of law question and determine whether Maine has articulated a strong public policy against allowing choice-of-law provisions to prevail over state statutes, and whether Maine's public policy interest is substantially greater than Illinois' interest in the outcome of the case. If we answer both of those question in the affirmative, we must consider whether there is a genuine issue of material fact regarding Volvo's argument that it terminated the FMS dealership for good cause.

Maine's public policy can best be determined "not by the varying opinions of laymen, lawyers, or judges as to the demands of the interest of the public, but rather, by its constitution and statutes, and, when cases arise concerning a matter upon which they are silent, by its judicial decisions and the constant practice of the government officials. The

policy must be well defined and dominant and may not be gleaned from general consideration of supposed public interests." *American Home Assurance Co. v. Stone*, 61 F.3d 1321, 1324 (7th Cir. 1995) (citations and internal quote marks omitted). The State of Maine has rendered this task exceedingly easy for us. One section of the Maine franchise law is titled "Public Policy."

> A contract or part of a contract or activity undertaken pursuant to a contract in violation of this chapter is deemed against public policy and is void and unenforceable.

10 M.R.S.A. § 1368. Under the section titled "Prohibited Conduct," we learn that it is unlawful for a manufacturer (such as Volvo or Samsung):

> B. To cancel, terminate, fail to renew or refuse to continue a franchise relationship with a distributor or dealer, notwithstanding the terms, provisions or conditions of an agreement or franchise or the terms or provisions of a waiver, unless a manufacturer:
>
> > (1) Has satisfied the notice requirement of section 1366;
> >
> > (2) Has acted in good faith as defined in this chapter; and
> >
> > (3) Has good cause for the cancellation, termination, nonrenewal or noncontinuance; or
>
> C. To terminate, fail to renew or refuse to continue any franchise relationship with a distributor or dealer, notwithstanding the terms, provisions or conditions of an agreement or franchise or the terms or provisions of a waiver, without good cause. The manufacturer has good cause for a termination, cancellation, nonrenewal or noncontinuance as follows.

**(1) Failure by the distributor or dealer to comply with a provision of the franchise agreement that is reasonable and of material significance to the franchise relationship when the manufacturer first acquired actual or constructive knowledge of the failure not more than 180 days before the date on which written notification is given pursuant to section 1366 is good cause.**

**(2) If the failure by the distributor or dealer, as set forth in subparagraph (1), relates to the performance by the distributor or dealer in sales or service, then good cause is the failure of the distributor or dealer to carry out effectively the performance provisions of the franchise when:**

**(a) The distributor or dealer was notified by the manufacturer in writing of that failure, the notification stated that notice was provided of failure of performance pursuant to this section and the distributor or dealer was given a reasonable opportunity for a period of not less than 6 months to make good-faith efforts to carry out the performance provisions;**

**(b) The failure continued within the period that began not more than 180 days before the date on which notification of termination, cancellation or nonrenewal was given pursuant to section 1366; and**

**(c) The distributor or dealer has not substantially complied with reasonable performance criteria established by the manufacturer and communicated to the distributor or dealer.**

**(3) There is good cause when the manufacturer and the dealer or distributor agree not to renew the franchise.**

> (4) There is good cause when the manufacturer discontinues production or distribution of the franchise goods.

10 M.R.S.A. § 1363.[2]

The Maine statute thus evidences a strong public policy against contracts that violate the franchise law generally. When we review the franchise law, we find that manufacturers may not terminate or fail to renew without good cause "notwithstanding the terms, provisions or conditions of an agreement or franchise or the terms or provisions of a waiver." 10 M.R.S.A. §§ 1363(B) & (C). We read this to mean that Maine law applies even when contracts purport to waive its protections. Maine has thus expressed a strong public policy against allowing choice-of-law provisions to prevail over state statutes, and we must determine whether Maine's public policy interest is substantially greater than Illinois' interest in the outcome of the case. Again, this is not a difficult assessment. Samsung, an original party to the contracts, was located in Illinois. Samsung transferred all of its interests to Volvo. None of the plaintiffs or defendants are citizens of Illinois and none of the franchises are located here. Maine's public policy therefore exceeds Illinois' interest in the outcome of the case.

---

[2]  Section 1366 provides:

> All notices of termination or nonrenewal required by this chapter must:
>
>> 1. Delivery. Be sent by registered, certified or other receipted mail, delivered by telegram or personally delivered to the distributor or dealer; and
>>
>> 2. Statement of intent. Contain a statement of intent to terminate or not renew the franchise together with the reasons for termination or nonrenewal and the effective date of the termination, nonrenewal or expiration.

This means that FMS is entitled to the protections of the Maine franchise law. Volvo maintains that it had good cause to terminate or fail to renew the agreements. Volvo contends that its legitimate business objective of consolidating its distribution network satisfies the good cause standard. Volvo also contends that it made a good faith business decision to withdraw Samsung-brand excavators and introduce remodeled Volvo-brand excavators, another good cause reason to terminate under the Maine law. The Maine statute provides that "[t]here is good cause when the manufacturer discontinues production or distribution of the franchise goods." The Samsung Dealers dispute Volvo's characterization of the withdrawal of Samsung products from the market. According to the Dealers, Volvo made modest improvements to some of the excavators and rebranded them but that the excavators essentially continued to be sold in a form covered by the Dealer Agreements. The Samsung Dealers characterize this as a unilateral decision to rebrand the product rather than a discontinuation of production or distribution of the franchised goods. At this stage of the proceedings, we believe there is a genuine factual dispute over whether Volvo had good cause to terminate FMS, and therefore we vacate and remand as to FMS only for trial as to the good cause issue under Maine law.

## C.

We have now determined that the Illinois, Texas and Montana statutes do not provide any additional protections for the Samsung Dealers. The Maine statute may provide some additional protection to FMS, the only franchise plaintiff located in Maine, and we are remanding on FMS' claims as we described above. All that remains, then, are the Samsung Dealers' arguments under the Illinois common law of contracts. The Samsung Dealers urge us to find that there is a material issue of fact regarding the terms of the

Dealer Agreements based on Samsung's representations to the Dealers before, during and after execution of the contracts. In particular, the Samsung Dealers maintain that the written agreements cannot be read in a vacuum but must be supplemented with Samsung's oral representations and with the course of dealing of the parties over the course of the relationships. The Samsung Dealers also contend that the contracts were modified by acquiescence in the modification through a course of conduct consistent with acceptance of the changed terms. The Dealers point out that Volvo continued its relationships with the Dealers even after the written documents had expired, including some cases where the agreements expired multiple times. The Samsung Dealers also continued investing in their dealerships in reliance on promises by Volvo that they would be given opportunities to continue as exclusive dealers of Volvo equipment if they performed beyond the terms of the written agreements. The Samsung Dealers charge Volvo with breaching the implied covenant of good faith and fair dealing by terminating the agreements without cause. The Dealers argue that even without a "for cause" term, the expectations of the parties temper Volvo's discretion in terminating the contracts. They also dispute the district court's judgment on their alternative theories of liability grounded in unjust enrichment and recoupment. Finally, they argue that their claims for tortious interference should survive summary judgement because they have provided sufficient evidence that Volvo was recruiting the Dealers' customers prior to the contract terminations. Some of these arguments are variations on a theme and will be addressed together. We will address the remainder *seriatim*.

**1.**

We begin by examining the language of the various Dealer Agreements, which are identical in all relevant respects:

> This Agreement may be terminated at any time by either party without cause by giving at least sixty (60) days written notice to the other party of such decision to terminate this Agreement.

R. 32, Ex. 1, ¶ 22.3. The Samsung Dealers do not argue that this paragraph is ambiguous. Rather, they insist that it must be read in conjunction with Samsung's oral assurances that the company would not use this clause unless a dealer was failing to perform adequately. This is a curious position for the Samsung Dealers to adopt because the next paragraph gives Samsung the option to terminate immediately, without notice, if the Dealers fail to pay Samsung in a timely fashion, or if there are changes in control at the dealerships, or if the Dealers breach their obligations to maintain insurance, among other things. The paragraph after that allows the company to unilaterally terminate the agreement on thirty days' notice if the Dealers fail to meet sales objectives, fail to maintain inventory and services up to Samsung's expectations, or fail to perform their obligations and duties to customers. R. 32, Ex. 1, ¶¶ 22.4 & 22.5. These paragraphs thus address the right of Samsung to terminate if the Dealers are failing to perform adequately. The termination without cause provision would thus be meaningless under the Dealers' reading.

Before we analyze the Dealers' claims under Illinois common law, we will quote other relevant contract language. First, the contract expressly contemplated the expiration of the Agreement by its own terms:

> Nothing contained herein shall be deemed to create any express or implied obligation on either party to renew or extend this Agreement or, if the Dealer is continued as the Company's dealer, to create any right to continue such relationship on the same terms and conditions contained herein. Each party, in its discretion, may

determine, for any reason whatsoever, not to renew or extend this Agreement or to continue such relationship on the terms and conditions contained herein.

R.32, Ex.1, ¶ 22.6. Next, the contract addressed what meaning to assign any additional transactions that occurred after the Agreement had formally terminated:

The consummation of any transaction of a type covered by this Agreement by mutual consent after the expiration or termination thereof shall, unless otherwise agreed in writing, be governed by the applicable provision of this Agreement but shall not be construed as reviving this Agreement or as in any way modifying the effectiveness of such expiration or prior termination.

R.32, Ex.1, ¶ 23.7. The contract also explicitly rejected oral modifications and confined the contract to the terms of the written document:

This Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes all prior agreements and understandings, whether oral or written. Except for changes by the Company permitted under this Agreement, no amendment or modification of this Agreement or any portion thereof shall be valid unless executed in writing by both parties.

R.32, Ex.1, ¶ 30. Finally, the Agreement specified that delays or failures in exercising rights were not to be construed as waivers:

Neither the failure nor any delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, or of any other right, power or remedy, nor shall any single or partial exercise of any right, power or remedy, preclude any further or other exercise thereof, or the exercise of any other right, power or remedy.

R. 32, Ex.1, ¶ 33.

The Samsung Dealers' first line of argument encourages us to use various forms of parol evidence to inform our reading of the Dealer Agreements. According to the Dealers, they asked Samsung about the meaning of the "termination without cause" provision and Samsung assured them, before signing and again after signing the contracts, that it had no intention of exercising that option unless the Dealers were not performing adequately. "Do the job, keep the line" was the fundamental tenet of the relationship, according to the Samsung Dealers, and all of the Dealers protest that they would not have invested hundreds of thousands of dollars to support the sale of the Samsung line but for their reasonable expectation that they would be able to continue their dealerships so long as they adequately performed. In addition to these oral promises, the Samsung Dealers claim that the contracts also consisted of terms that arose through the course of dealing and custom and usage in the industry. Before Volvo terminated these dealerships, no Dealer had been terminated except for cause, demonstrating that terminations could only be for cause, according to the Dealers. The Dealers also maintain that the contracts were modified by Samsung's acquiescence to certain changes in the relationships. In particular, the Dealers claim that Samsung's sale of products to the Dealers even after the contracts expired by their own terms demonstrated that the Dealers would be allowed to keep the line so long as they adequately performed. In sum, the Samsung Dealers urge us to find that the contracts were supplemented by oral statements (made both before and after the contracts were signed) and the conduct of the parties after the contracts were signed.

The interpretation or legal effect of a contract is a question of law to be determined by the court. *Bowers Mfg. Co., Inc. v. Chicago Mach. Tool Co.*, 453 N.E.2d 61, 66 (Ill. App. 2d Dist. 1983). In interpreting a contract, we may not con-

sider evidence of a prior agreement or contemporary oral agreement that would contradict the written agreement. *Bowers Mfg.*, 453 N.E.2d at 64-65.

> An agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.

*Western Illinois Oil Co. v. Thompson*, 186 N.E.2d 287, 291 (Ill. 1962). The only exception to this rule is for ambiguous contracts. *Pioneer Trust & Sav. Bank v. Lucky Stores, Inc.*, 414 N.E.2d 1152, 1154 (Ill. App. 1st Dist. 1980). Extrinsic evidence is admissible to show the true meaning of an ambiguous contract. *Id.* Determining whether a contract is ambiguous in the first place is a question of law. "A contract is ambiguous only if the language employed is susceptible of different constructions when read in its plain and ordinary meaning." *Althoff Indust., Inc. v. Elgin Med. Ctr., Inc.*, 420 N.E.2d 800, 803 (Ill. App. 2d Dist. 1981). Thus, before we may consider the Samsung Dealers' extrinsic evidence, we must determine whether the contracts are ambiguous.

On the issue of termination without cause, the Dealer Agreements are not ambiguous. The contracts each state that the agreement may be terminated at any time by either party without cause by giving at least sixty days written notice to the other party. The language could not be more plain, and the Samsung Dealers have not suggested any viable alternate meaning. The Dealers urge us to find that this provision really means that Samsung could terminate only if the dealers were not performing adequately. Another provision, however, gives Samsung the unilateral power to terminate for nonperformance on thirty days' notice. Samsung's right to terminate without cause on

sixty days' notice (a right which extended to the Dealers as well, incidentally) must mean what it says or the provision is rendered superfluous. Moreover, the contracts themselves provide that they may not be modified orally, and that the written agreement supercedes all prior oral statements. A party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and had a full opportunity to read it. *Northern Trust Co. v. VIII South Michigan Assoc.*, 657 N.E.2d 1095, 1103 (Ill. App. 1st Dist. 1995) ("A party cannot close his eyes to the contents of a document and then claim that the other party committed fraud merely because it followed this contract.").

Post-signing conduct does not move the Dealers any closer to rewriting the Dealer Agreements. Again, the contract itself contains a waiver clause providing that a failure or delay in exercising a right will not operate as a waiver. That Samsung had never terminated a Dealer without cause did not preclude Volvo from using that provision later. Nor does the sale of products to the Dealers after some of the Dealer Agreements had expired by their own terms indicate that the Dealers would never be terminated except for cause. Again, the contracts provided for the possibility of transactions occurring after expiration, and specified that post-termination transactions would be governed by the applicable provisions of the Dealer Agreement but would not be construed as reviving the Agreement or modifying the effectiveness of the termination. The Samsung Dealers' citation to *Maher & Assoc. v. Quality Cabinets*, 640 N.E.2d 1000 (Ill. App. 2d Dist. 1994), is unavailing. That case holds that a contract may be validly modified if the party that did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance. 640 N.E.2d at 1007. Here the alleged "change" to the agreements was

that they could not be terminated without cause. The change was allegedly brought about by Samsung's failure to ever terminate a Dealer without cause and by Samsung's continued transactions with Dealers after the expiration of some of the Agreements. But both of these occurrences were contemplated by the contract and Samsung never had a chance to acquiesce to different terms. The change was never proposed by the Samsung Dealers, and the change contradicted the written contracts. Termination without cause was an event that could happen only once for each Dealer and thus there could be no course of conduct. Samsung was also following the terms of the written agreements when it engaged in post-termination transactions with the Dealers. On some occasions, Samsung signed new agreements with certain Dealers when it intended to reinstate a fixed-term relationship. Samsung's conduct could not reasonably be interpreted as acquiescence under these circumstances. In sum, we reject the Samsung Dealers' invitation to rewrite the contracts with extrinsic evidence because the contracts are unambiguous.

### 2.

We address next the Samsung Dealers' claim that Volvo breached the implied covenant of good faith and fair dealing by terminating the contracts without good cause. Every contract contains an implied promise of good faith and fair dealing between the contracting parties. *Northern Trust*, 657 N.E.2d at 1104. *See also Dayan v. McDonald's Corp.*, 466 N.E.2d 958, 989-90 (Ill. App. 1st Dist. 1984) (a covenant of good faith and fair dealing is implied into every contract unless expressly disavowed). Generally, problems involving the covenant of good faith and fair dealing arise when one party to a contract is given broad discretion in performance. *Northern Trust*, 657 N.E.2d at 1104; *Dayan*, 466 N.E.2d at

990. The covenant requires a party vested with broad discretion to act reasonably and not arbitrarily or in a manner inconsistent with the reasonable expectations of the parties. *Northern Trust*, 657 N.E.2d at 1104. Illinois courts use the covenant to determine the intent of the parties where a contract is susceptible to two conflicting constructions. *Id.* This is not such a case.

As we discussed above, the contracts very clearly give the right to terminate without cause on sixty days' notice to both parties. There is no ambiguity and the provision does not vest a single party with discretion but rather grants both parties the unfettered right to terminate. Illinois law holds that parties to a contract are entitled to enforce the terms to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract. *Northern Trust*, 657 N.E.2d at 1104; *Jespersen v. Minnesota Mining & Mfg. Co.*, 681 N.E.2d 67, 71 (Ill. App. 1st Dist. 1997). "[T]he duty of good faith and fair dealing does not override the clear right to terminate at will, since no obligation can be implied which would be inconsistent with and destructive of the unfettered right to terminate at will." *Jespersen*, 681 N.E.2d at 71.

The Samsung Dealers rely on *Dayan* for an additional obligation in the case of franchise agreements. The court in *Dayan* was addressing for the first time the Illinois common law as it related to termination without cause of franchisees by franchisors. The court noted that a number of other courts had refused to enforce termination without cause provisions in franchise agreements, especially where the franchisor held broad, unilateral powers of termination at will. 466 N.E.2d at 973. This practice was the result of judicial concern over longstanding abuses in franchise relationships, apparently, and the court found that the then-recently passed (but not retroactively applicable) Franchise Disclosure Act expressed the same public policy that many

of these courts had recognized. That is, a franchisor may not terminate a franchisee without good cause. *Id.* The court accepted as good cause for termination any failure by the franchisee to substantially comply with obligations under the agreement, but also noted that good cause turns generally on commercial reasonability. *Dayan*'s reasoning does not save the Samsung Dealers' claims for a few reasons. First, the cases on which *Dayan* relied dealt with contracts that contained no express provision that the contract could be terminated without good cause. *Dayan*, 466 N.E.2d at 972-73. The Dealer Agreements each contained an express clause allowing termination without cause. Second, the *Dayan* court's rationale depended in part on the unilateral nature of the franchisor's right to terminate without cause, and abuses of that practice. In our case, both the franchisor and the franchisee hold the right to terminate. We have no doubt that if Volvo began producing an inferior product, the Samsung Dealers would be here enforcing *their* right to terminate the franchise agreements. The clause protected both parties in the event that Samsung's business was sold. Third, later cases in Illinois clarify that the duty of good faith and fair dealing cannot override an express term of a contract. *Northern Trust*, 657 N.E.2d at 1104; *Jespersen*, 681 N.E.2d at 71. In short, Volvo cannot be held to have breached the covenant of good faith and fair dealing for simply enforcing the contracts as written.

### 3.

The Samsung Dealers sought relief on quasi-contractual grounds in the alternative. They claimed that Volvo was unjustly enriched by the Dealers' substantial investments of time and money in building up business for Samsung (and subsequently Volvo) products. They complain that they

relied on Samsung's promises of continued business so long as they performed adequately. As a result of their efforts, the Dealers believe that Volvo has been unjustly enriched by co-opting the product lines that had been developed by the Dealers for Volvo's own dealership network. The Dealers also brought a claim for recoupment. The substance of that claim is that the Dealers invested considerable resources into the establishment of dealerships for Samsung's products and Volvo then terminated the dealerships without giving the Dealers an opportunity to recoup their investment.

The district court granted summary judgment on the Samsung Dealers' claims for unjust enrichment and recoupment on the grounds that, in Illinois, quasi-contractual relief is available only where there is no express contract between the parties. We agree. "Quasi-contractual relief is available when one party has benefitted from the services of another under circumstances in which, according to the dictates of equity and good conscience, he ought not to retain such benefit." *Barry Mogul & Assoc., Inc. v. Terrestris Dev. Co.*, 643 N.E.2d 245, 251 (Ill. App. 2d Dist. 1994). But a plaintiff may not pursue a quasi-contractual claim where there is an enforceable, express contract between the parties. *Id.*; *Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.*, 601 N.E.2d 956, 964 (Ill. App. 1st. Dist. 1992) (promissory estoppel not available when parties have entered a binding contract on the same subject matter). "Quasi-contract is not a means for shifting a risk one has assumed under a contract." *Barry Mogul*, 643 N.E.2d at 251-52 (quoting *Industrial Lift Truck Serv. Corp. v. Mitsubishi Int'l Corp.*, 432 N.E.2d 999, 1002 (Ill. App. 1st Dist. 1982)). The Samsung Dealers signed an unambiguous contract that gave both parties the right to terminate without cause on sixty days' notice. They cannot now use quasi-contractual theories to shift the risk that they knowingly assumed. They misconstrue the doctrine of pleading

in the alternative. Under that doctrine, a party is allowed to plead breach of contract, or if the court finds no contract was formed, to plead for quasi-contractual relief in the alternative. Once a valid contract is found to exist, quasi-contractual relief is no longer available.

**4.**

Finally, the district court granted summary judgment in favor of Volvo on the Samsung Dealers' claims for tortious interference. The Dealers argue that they had valuable long-term relationships with their customers and with Samsung and Volvo. They claim to have invested heavily in their commercial relationships with Samsung, Volvo, their customers and prospective customers in reliance on Samsung's representations. The Dealers claim a two-fold tortious interference with contract and prospective economic advantage. First, they maintain that Volvo's cancellation of the Dealer Agreements amounted to tortious interference with the Dealers' customers. They also contend that Volvo contacted the Dealers' customers to encourage them to buy products from Volvo dealers rather than from the Samsung Dealers, even prior to terminating the Dealer Agreements.

Second, they argue that the termination of the Dealer Agreements constituted tortious interference with the contractual relationships between Volvo and each of the Dealers. This latter argument is easily addressed. A party may not be charged with tortious interference with respect to its own contract. That is, termination of the Dealer Agreements by Volvo cannot constitute tortious interference by Volvo because Volvo is a party to those contracts. *See Douglas Theater Corp. v. Chicago Title & Trust Co.*, 681 N.E.2d 564, 567 (Ill. App. 1st Dist. 1997) ("a party cannot tortiously interfere with his own contract; the tortfeasor must be a third party to the contractual relationship").

The Dealers' other theory requires a little more analysis. It is unclear from the Dealers' briefs and even from the complaint whether the Dealers are claiming interference with customer contracts or with prospective contracts with customers. The elements of the tort of intentional interference with contractual relations are: (1) the existence of a valid and enforceable contract; (2) the defendant's awareness of the contractual relation; (3) the defendant's intentional and unjustified inducement of breach of the contract; (4) a subsequent breach by the other contracting party caused by the defendant's wrongful conduct; and (5) damages resulting from the breach. *Hi-Tek Consulting Services, Inc. v. Bar-Nahum*, 578 N.E.2d 993, 997 (Ill. App. 1st Dist. 1991). On reviewing these elements, we note that the Dealers have not alleged or presented any evidence that customers breached already-existing agreements because of Volvo's conduct. Thus they cannot make out a claim for tortious interference with contract.

The Dealers' claims seem instead to be more in the nature of interference with prospective business or economic advantage. The elements of that claim are: (1) the plaintiff's reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful or intentional interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from the interference. *Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 7-8 (Ill. App. 1st Dist. 1995). The Samsung Dealers have arguably established material questions of fact on each of these elements.

Volvo counters with two arguments. First, Volvo maintains that the Samsung Dealers' claims are barred by the Illinois economic loss rule, sometimes called the *Moorman* doctrine. *See Moorman Mfg. Co. v. National Tank Co.*, 435 N.E.2d 443, 453 (Ill. 1982) (a plaintiff may not recover for

solely economic loss under the tort theories of strict liability, negligence and innocent misrepresentation). We can dispense with this argument easily. The *Moorman* doctrine does not apply to actions for intentional interference with contract or intentional interference with prospective business advantage. *See 2314 Lincoln Park West Condo. Assoc. v. Mann, Gin, Ebel & Frazier, Ltd.*, 555 N.E.2d 346, 352 (Ill. 1990) (collecting cases).

Second, Volvo maintains that the third element of intentional interference with prospective business advantage requires a plaintiff to prove that the defendant acted without legal justification or with malice in preventing the plaintiff's expectancy from ripening into a valid business relationship. *See IK Corp. v. One Fin. Place P'ship*, 558 N.E.2d 161, 172 (Ill. App. 1st Dist. 1990) (requiring intentional and malicious interference to establish the tort). *See also Bar-Nahum*, 578 N.E.2d at 997 ("[l]ack of legal justification for the conduct of the defendant is essential in establishing a claim for tortious interference with contractual relations."). Other cases characterize this as an affirmative defense, holding that a defendant may have a privilege to compete that defeats an action for intentional interference with prospective business advantage. *Soderlund Bros.*, 663 N.E.2d at 8. "The privilege to engage in business and to compete allows one to divert business from one's competitors generally as well as from one's particular competitors provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will." *Id.* One court characterized interference as "justified" when it is done to protect one's financial interest, or to further one's own goals. *IK Corp.*, 558 N.E.2d at 172. Whether it is an element of the claim or an affirmative defense, if the Samsung Dealers are unable to demonstrate a genuine issue of material fact on that point, their claim cannot survive summary judgment.

A defendant is entitled to the protection of the privilege of competition provided that the defendant has not employed a wrongful means or is not motivated solely by malice or ill will. *Soderlund Bros.*, 663 N.E.2d at 10. The crux of the Samsung Dealers complaint is that Volvo "recruited" the Dealers' customers prior to the time of termination. That is, Volvo encouraged the Dealers' customers to buy products from Volvo dealers rather than from the Samsung Dealers. The Samsung Dealers state without citation to the record that they have provided sufficient evidence to establish that Volvo recruited the Samsung Dealers' customers prior to the time of termination. We could affirm the grant of summary judgment on this failure of evidence alone, but we will address the claim in substance because Volvo responds to the Dealers' citations to the record in the district court. Volvo states that the Dealers' claim is based on Volvo's truthful statements to the customers that Samsung-brand excavators would no longer be available, having been replaced by new, redesigned Volvo products that would be sold by Volvo dealers. The Samsung Dealers do not challenge this characterization of the evidence in their reply brief, and this is fatal to the claim. "There is no liability for interference with a prospective contractual relation on the part of one who merely gives truthful information to another." *Soderlund Bros.*, 663 N.E.2d at 10. Volvo's statements to the customers were true and were protected by the privilege of competition. Without any evidence to the contrary, the Samsung Dealers' claim for tortious interference with prospective business advantage cannot survive summary judgment.

## III.

We therefore affirm the district court's grant of summary judgment with respect to all of the claims except for FMS's

statutory claim under Maine law. That claim we remand to the district court for further proceedings consistent with this opinion. Costs are awarded to the defendants on all claims except in the case of FMS's statutory claim under Maine law. As to that claim, each party shall bear their own costs.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.

A true Copy:

    Teste:

                          _____
                          *Clerk of the United States Court of*
                             *Appeals for the Seventh Circuit*